Gerrit M. Pronske
State Bar No. 16351640
Rakhee V. Patel
State Bar No. 00797213
Christina W. Stephenson
State Bar No. 24049535
**Pronske & Patel, P.C.**
1700 Pacific Ave., Suite 2260
Dallas, Texas 75201
(214) 658-6500 – Telephone
(214) 658-6509 – Facsimile
Email: gpronske@pronskepatel.com
Email: rpatel@pronskepatel.com
Email: cstephenson@pronskepatel.com

COUNSEL FOR HENRY S. MILLER COMMERCIAL, LLC

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** § | | |
| § | | |
| **HENRY S. MILLER COMMERCIAL,** § | **CASE NO. 09-34422-HDH-7** | |
| **LLC,** § | | |
| § | | |
| **Alleged Debtor.** § | **CHAPTER 7 CASE** | |

**MOTION TO DISMISS INVOLUNTARY PETITION**

TO THE HONORABLE HARLIN D. HALE,
UNITED STATES BANKRUPTCY JUDGE:

Henry S. Miller Commercial, LLC ("HSMC" or "Alleged Debtor"), files this Motion to Dismiss Involuntary Petition ("Motion") pursuant to 11 U.S.C. §§ 303, 305, 707(a), Federal Rules of Bankruptcy Procedure 1011(b) and 1013, and Federal Rule of Civil Procedure 12(b) and respectfully represents as follows:

### I.    FACTUAL BACKGROUND

1.    The Henry S. Miller Company was established in 1914. In March 1994, the Miller family announced the formation of Henry S. Miller Commercial Co. ("HSMC"), a full service real estate company to serve the commercial needs of its clients and embrace the expanding

commercial real estate market. Effective January 1, 2007, Henry S. Miller Commercial Co. converted to Henry S. Miller Commercial, LLC, the alleged debtor herein, in accordance with the provisions of Article 5.17 of the Texas Business Corporation Act and Section 10.01 of the Texas Business Organization Code.

2.   The facts that led to this proceeding center around a large confidence scheme orchestrated by one man: James Flaven. Flaven, a Massachusetts truck driver, held himself out as the scion of a wealthy family of real estate investors. Over a period of one year, Flaven convinced multiple parties, including his real estate agent, Steven Defterios ("Defterios"), prospective real estate seller Barry Nussbaum ("Nussbaum"), and Nussbaum's real estate agent Tom Warren ("Warren") that Flaven intended to utilize a $300 million trust fund to purchase Texas real estate as investment property.

3.   Flaven contacted Defterios in 2004, representing that he had a $300 million trust fund coming due and was looking to invest the proceeds in apartment buildings in Texas. At all relevant times, Defterios was an independent contractor with HSMC. Flaven gave Defterios contact information for individuals who could confirm the trust information.

4.   During this time, San Diego based real estate investor Nussbaum, through various single purpose entities (the "Nussbaum Companies"),[1] was trying to sell several apartment complexes in the Bachman Lake area of Dallas. Nussbaum's business model was to assemble investors, form a limited partnership to purchase multifamily property in need of rehabilitation and with a high vacancy rate, perform the necessary work to upgrade the property and lower its vacancy rate, and then sell the property at a profit. The Bachman Lake properties owned by

---

[1] Consisting of the following: Dallas Bayou Bend, Ltd., Dallas Clubview Gardens, L.P., Pecan Square, Ltd., Woodside Apartments, L.P., BNC Meadowbrook Crossing, LP. as Meadowbrook, L.L.C., BNC Lake Jackson Village, L.P., BNC Regency Walk, L.P., BN Regency, L.L.C., Park Ridge Apartments, L.P., and BNC South Loop Associates, L.P.

**MOTION TO DISMISS INVOLUNTARY PETITION –Page 2**

Nussbaum had languished on the market for some time; Nussbaum had not yet found buyers willing to pay the prices he was willing to accept.

5. In February 2004, Defterios contacted Nussbaum's broker, Tom Warren, about Flaven's potential purchase of the Bachman Lake properties. Warren put Defterios in touch with Nussbaum. Defterios related Flaven's representations regarding his supposed trust and intentions to purchase real estate using that trust. Warren spoke directly with Flaven in March 2004, at which time Flaven confirmed what Defterios had said. Warrren thereafter met with Flaven in Dallas. When questioned about the transaction and his intentions, Flaven repeated what Warren had previously been told on the subject by Defterios and Flaven. Although he had some doubts, Warren believed Flaven was telling the truth, was serious about purchasing the properties, and could close on the deal.

6. Negotiations went forward during March and April of 2004. The deal, initially all-cash, evolved to include a financing contingency to permit Flaven's trust to borrow money against itself to fund the purchases if it chose to do so. At Warren's request, Defterios put him in touch with Flaven's lender, who confirmed this arrangement.

7. On April 27, 2004, the Nussbaum Companies entered into nine purchase and sale agreements with Orleans Properties, L.P., a single purpose entity set up by Flaven as a vehicle for the purchase. The nine properties included apartment complexes in the Bachman Lake area, two in Fort Worth and one each in Seagoville, Houston and Lake Jackson, as well as a nine-story office building in Houston. The purchase prices totaled $94,665,000.00, less a $5,000,000.00 allowance for deferred maintenance. The contracts contained a 90 day inspection period, a 120 day financing contingency period, and called for closing within 15 days after expiration of the later. The contracts also required an earnest money deposit of $500,000.00 upon execution, with $50,000.00

becoming non-refundable at the end of the inspection period and the remaining $450,000.00 becoming non-refundable at the end of the financing contingency period. They provided that, "in view of the uncertainty of determining actual damages sustained by Seller," termination of the contract and retention of the escrow money as liquidated damages would be the seller's sole remedy for the buyer's breach. It later came to light that the earnest money payment did not come from the Flaven trust, but rather from a group of Tennessee physician investors.

8.  Even before the contracts were signed, Flaven had begun his due diligence on the properties, as any reasonably prudent, informed commercial party would expect. He hired a reputable construction firm to make structural inspections of the properties and to identify needed capital improvements. Through Defterios, he also hired a reputable real estate consulting firm to appraise the properties. Flaven also contacted the property management division of the HSM Companies about taking over the management of the properties after closing and supervising any renovations. The deals bore all the hallmarks of legitimacy.

9.  In due time, the transactions were set for closing; however, for a myriad of reasons, such closings were postponed repeatedly. Throughout this time, Nussbaum pressed Defterios for information (including a commitment letter) from Flaven's lender and trust administrator that he could pass onto his lenders to stave off foreclosure. Defterios relayed the limited information that he received. No commitment letter was forthcoming, but throughout October 2004, Flaven and the trust administrator continued to assure everyone that funding was imminent. Flaven wrote to Nussbaum on December 18, 2004, stating that funding from the trust was imminent, and that in the event of further delays, Flaven's father would advance sufficient funds to start closing the first parts of the deal before the end of the year, and the remaining parts of the deal in January of 2005.

As late as April 5, 2005, Flaven was promising imminent funding, but by then Nussbaum knew better.

10. Nussbaum, the jilted seller, had just cause to pursue Flaven for breaching the contracts to purchase his properties. However, instead of pursuing the causes of action held against the judgment-proof Flaven, Nussbaum decided to file lawsuits against Defterios, as Flaven's real estate agent, and HSMC.

11. In 2006, the Nussbaum Companies filed the state court action against HSMC and Defterios in the District Court of Dallas County, Texas, 14th Judicial District, Cause 06-12902-A (the "Lawsuit"). The Nussbaum Companies asserted fraud and negligent misrepresentation arising out of the set of transactions that failed to close due solely to Flaven's inability to fund the purchase prices, seeking damages exceeding $30 million.

12. Based upon the filing of the Lawsuit, HSMC tendered a claim to its insurance carrier, Diamond State Insurance Company ("Diamond State"). Diamond State provided a defense pursuant to a reservation of rights and appointed Steve Terry ("Terry") from the Law Firm of Newsom, Terry & Newsom to represent HSMC and Defterios in the Lawsuit.

13. The trial record does not reflect the motive for Flaven's elaborate scheme of deception, except perhaps for his receipt of $56,000.00 in earnest money that he had not himself put up. Nor does it provide any motive for Defterios to allegedly "deliberately falsify information" provided to the sellers - Defterios spent virtually his full time on these transactions for over a year for no compensation other than a $6,200.00 payment from Flaven. Further, Nussbaum's own real estate agent, Warren, testified that he never had any doubts that Defterios believed the truth and validity of the information regarding Flaven's assets.

14. Six of the nine properties were eventually sold to other buyers, in two cases for $1 plus assumption of the debt on the properties. Nussbaum's companies remained the record owner of the remaining three properties at the time of the trial. Prior to trial, Diamond State did not attempt to engage in any type of settlement negotiations nor did it offer any money to settle the Lawsuit.

15. From the Lawsuit's filing to date, HSMC and Defterios have unequivocally asserted that Defterios did nothing more than honestly and non-negligently pass along information that he had received from his client and from others purporting to speak about his client's affairs.

16. At the conclusion of the trial, the jury found against HSMC and Defterios on fraud and negligent misrepresentation. On or about December 1, 2008, the state court rendered a judgment against HSMC and Defterios aggregating $8,918,719.99 (the "Judgment"). HSMC and Defterios immediately perfected their right to appeal the Judgment by filing a notice of appeal (No. 5-08-01726-cv) which is presently pending in the Court of Appeals for the Fifth District of Texas at Dallas. Briefing is complete with the exception of Appellant's Reply Brief and the parties have requested oral argument that, to date, has yet to be scheduled. Mediation in the appeal is set for August 5, 2009.

17. HSMC and Defterios presented the following issues on appeal of the Judgment:

   a. The damage awards in the Lawsuit consist solely of consequential damages, recoverable only if they were proximately caused by the HSMC and Defeterios' alleged misrepresentations, *i.e.*, only if they flowed from the misrepresentations in a natural and continuous sequence and were foreseeable. The damage awards in the Lawsuit do not meet that standard. Specifically,

      i. The evidence at trial showed that expenditures for capital improvements and short term operating losses were a part of the Nussbaum Companies' normal business model for properties such as these, and that the risks of declining market values and long-term operating losses were risks they knowingly incurred. HSMC and

        Defeterios' alleged misrepresentations did not proximately cause these elements of damage.

    ii. The Nussbaum Companies sought recovery for their capital investments in the properties, but failed to show the extent to which of these investments were lost, *i.e.*, failed to show the extent to which the investments were or were not translated into a commensurate increase in the properties' market values. The Nussbaum Companies may not recover these damages in the absence of such a showing.

    iii. The evidence at trial showed that normal marketing times for the properties were six to twelve months. Losses incurred during much longer damage periods claimed by most of the Nussbaum Companies were not proximately caused by HSMC and Defterios' alleged misrepresentations.

b. Certain of the Nussbaum Companies were permitted to recover consequential damages under a "benefit-of-the-bargain" theory, consisting of consequential losses that allegedly would not have been incurred had HSMC and/or Defterios' representations been true. This was not proper.

    i. Benefit-of-the-bargain theory is only applicable to direct damages; the proximate cause requirement for consequential damages precludes use of the benefit-of-the-bargain theory for such damages.

    ii. As a general matter, benefit-of-the-bargain damages are not recoverable for common-law fraud.

    iii. Benefit-of-the-bargain damages are not recoverable for common-law fraud not consisting of fraudulent inducement of a contract between the Nussbaum Companies and HSMC and/or Defterios.

c. The evidence at trial showed that one apartment complex was owned jointly by two of the Nussbaum Companies in unspecified proportions, but the charge inquired as to the damages of only one of the co-owners. The jury's answer as to this particular plaintiff was not supported by evidence; therefore, the claim of the other co-owner was waived.

18. Diamond State delivered a letter to HSMC on January 15, 2009, exercising the insurer's reservation of rights and denying its insureds' request for indemnity under the insurance policy. In response to Diamond State's denial of coverage, on February 4, 2009, HSMC and Defterios filed a lawsuit seeking insurance coverage (Cause No. 0-1306) in the 101st Judicial

**MOTION TO DISMISS INVOLUNTARY PETITION –Page 7**

District, in the District Court of Dallas County, Texas (the "Coverage Lawsuit") against Diamond State, the Newsom Law Firm and Terry for their negligence and malfeasance in the handling of the underlying claim and the underlying lawsuit which resulted in the Judgment.

19. Based on that same Judgment, on or about July 7, 2009, three of the Nussbaum Companies (collectively, the "Appellees") commenced this involuntary bankruptcy case (the "Case") against HSMC by filing the *Involuntary Petition* (Docket No. 1) (the "Involuntary Petition"). The Appellees seek to utilize this Court to collect upon their Judgment, which is a two-party dispute that does not belong in Bankruptcy Court. Consequently, HSMC is challenges this filing as improper for the reasons stated below.

## II. MOTION TO DISMISS

**A. The Appellees Do Not Qualify as Three Petitioning Creditors.**

20. The Appellees do not qualify as petitioning creditors under 11 U.S.C. § 303(b)(1) because there are not three or more entities, each of which is a holder of a valid, legitimate, separate claim against HSMC. HSMC has more than twelve (12) creditors, requiring that the involuntary case be commenced by three or more entities. 11 U.S.C. § 303(b)(1).

21. Appellees have disregarded appropriate corporate form, which is apparent from the face of the Involuntary Petition. The signature for each of the Appellees reads, "Barry Nussbaum, BNC Real Estate" with a notation written out to the side, "Title: President of Manager Member of its General Partner." HSMC is left to conclude that the Appellees allege that BNC Real Estate is the managing member of an undisclosed general partner for each of the Appellees. No effort is made to specify the identity of the general partners of the Appellees. Upon information and belief, BNC Real Estate is neither the general partner nor the managing member of the undisclosed general partner for any of the Appellees.

**MOTION TO DISMISS INVOLUNTARY PETITION –Page 8**

22. Furthermore, upon information and belief, the Appellees are merely special purpose entities formed by Nussbaum for the purpose of purchasing, rehabilitating and then selling properties. Upon information and belief, the Appellees are merely instruments used by Nussbaum or one parent entity in carrying out his personal business model with different properties. As such, the Appellees are either alter egos of Nussbaum or one parent entity or under such control by Nussbaum that they should be treated as one entity for analysis under section 303(b).

23. Further, as described above, the Lawsuit alleged fraud and negligent misrepresentation on the part of Defterios and HSMC in the events surrounding Orleans Property, L.P.'s entry into and subsequent default on nine purchase and sale agreements (the "Deal"). The alleged fraud and misrepresentation were as to the entirety of the Deal and the events surrounding it. Upon information and belief, both parties thought of the Deal as a whole, as evidenced by Nussbaum's email to Defterios in 2005 stating, "[b]etween us, I think the deal is pretty much dead."

24. The division of the Appellees into three entities, for the "three creditors" determination, is artificial and should therefore be ignored. To hold otherwise would be to elevate the form of the sale agreements over the substance of the transaction as understood by the parties, including Nussbaum. Therefore, the Judgment against HSMC should be viewed as a single claim, inadequate to satisfy the jurisdictional requirements of section 303(b).

**B.    Appellees Do Not Satisfy the Jurisdictional Threshold of Section 303(b) Because the Judgment Is the Subject of a Bona Fide Dispute as to Liability and Amount.**

25. Furthermore, the jurisdictional requirements of section 303(b) are not met because the Judgment is contingent as to liability and is subject to a bona fide dispute as to liability and/or amount. The Appellees purport to be creditors of HSMC pursuant to the Judgment, which

is the subject of a properly perfected, nearly fully briefed appeal before the Court of Appeals for the Fifth District of Texas in Dallas. In addition, mediation in the appeal is set for August 5, 2009. Through the appeal, HSMC vigorously contests the state court's findings. As set out fully in the factual recitation above, there exists a bona fide dispute as to the validity and amount of the Judgment upon which the Appellees' claims are based.

**C.     Dismissal Under 11 U.S.C. § 305 Is in the Best Interest of Creditors.**

26.     Courts may also dismiss an involuntary case under section 305(a)(1) if such dismissal is in the best interests of the debtor and all creditors. 11 U.S.C. § 305(a)(1). The petition should be dismissed if petitioning creditors have adequate remedies under state law. *See In re Kass*, 114 B. R. 308, 309 (Bankr. S.D. Fla. 1990); *In re Frailey*, 144 B.R. 972 (Bankr. W.D. Penn. 1992).

27.     Here, the Appellees have adequate remedies under state law that enable them to levy and execute against HSMC's property. Furthermore, there is little or no prejudice to the Appellees if the present involuntary petition is dismissed. This is a two-party dispute between Nussbaum and HSMC. The Judgment is the only potential obligation of HSMC that is not current. HSMC's other creditors, *i.e.* any creditor not a party to the Judgment, would all be in jeopardy of being cast into a bankruptcy that is not a voluntary choosing of HSMC, having their obligations not be paid on an ongoing basis, and add additional administrative expense for the creditors, for the sole goal of allowing the Appellees to handcuff HSMC's operations to collect the Judgment. Based on the foregoing, it is in the best interest of the parties to dismiss the Involuntary Petition.

**D.    The Appellees Filed the Involuntary Petition in Bad Faith.**

28.    Section 707(a) provides, in relevant part, that the "court may dismiss a case under this chapter only after notice and a hearing and only for cause."

29.    The Appellees filed the Involuntary Petition in bad faith for the purpose of frustrating, impeding, hindering or delaying the Appeal, as well as to harass or embarrass HSMC into satisfying the Judgment, despite the fact that HSMC disputes the Judgment in its entirety. The Involuntary Petition was filed as a litigation tactic in what is a two-party dispute, currently pending in another forum and not for the purpose of reorganizing, rehabilitating, or liquidating HSMC's business or financial affairs or to protect the interests of HSMC, any of its creditors or any other party in interest, other than Appellees.

**E.    Reservation of Rights.**

30.    HSMC reserves the right to file a brief in support of this Motion to Dismiss Involuntary Petition.

31.    HSMC further reserves its rights to respond to the Involuntary Petition pursuant to Federal Rule 12(a), as provided by Federal Rule of Bankruptcy Procedure 1011(c), and expressly does not waive any other defenses, claims or rights to which it is justly entitled, including, but not limited to, filing an answer denying any element set forth in 11 U.S.C. § 303(h), controverting and denying that HSMC is not generally paying its debts as such debts become due and/or asserting a counterclaim, and filing any other motion, brief, notice or other pleading as allowed by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

32.    HSMC does not waive any rights or claims is may have or hold pursuant to 11 U.S.C. §§ 303 (e), (h), (i), (j) or (l).

WHEREFORE PREMISES CONSIDERED, HSMC respectfully requests that the Court enter an order dismissing the Involuntary Petition with prejudice and for such other and further relief to which it may be justly entitled.

Dated: July 30, 2009

Respectfully submitted,

By:  /s/ Rakhee V. Patel_____
Gerrit M. Pronske
State Bar No. 16351640
Rakhee V. Patel
State Bar No. 00797213
Christina W. Stephenson
State Bar No. 24049535
Pronske & Patel, P.C.
1700 Pacific Avenue, Suite 2260
Dallas, Texas 75201
Telephone: 214.658.6500
Facsimile: 214.658.6509
Email: grponske@pronskepatel.com
Email: rpatel@pronskepatel.com
Email: cstephenson@pronskepatel.com

**COUNSEL FOR HENRY S. MILLER COMMERCIAL, LLC**

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on July 30, 2009 I caused to be served the foregoing pleading upon the parties listed below via the Court's electronic transmission facilities and/or United States mail, first class delivery.

/s/ Christina W. Stephenson
Christina W. Stephenson

Howard Marc Spector
Spector & Johnson, PLLC
12770 Coit Road, Suite 1100
Dallas, Texas 75251

**MOTION TO DISMISS INVOLUNTARY PETITION –Page 12**