U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed September 11, 2009

United States Bankruptcy Judge

---

THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HENRY S. MILLER COMMERCIAL, LLC, | § | Case No. 09-34422-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

**MEMORANDUM OPINION AND ORDER RESOLVING CERTAIN LEGAL "STANDING" ISSUES PRESENTED IN: (A) MOTION TO DISMISS INVOLUNTARY CASE FILED BY ALLEGED DEBTOR [DE #5]; AND (B) MOTION TO STRIKE PORTIONS OF MOTION TO DISMISS [DE #15] FILED BY PETITIONING CREDITORS**

### I. INTRODUCTION.

Before this court are two discreet, yet multi-faceted legal "standing" questions pertaining to the involuntary bankruptcy petition that was commenced on July 7, 2009, against Henry S. Miller Commercial, LLC ("Miller" or the "Alleged Debtor"). In other words, before the above-referenced case is even permitted to go to an evidentiary hearing on the merits of the involuntary bankruptcy petition—to determine whether Miller is or is not generally paying its debts as they become due (11 U.S.C.

§ 303(h)(1))—there is a question that must be answered as to whether the involuntary petition was, in fact, commenced by: (a) three or more entities, (b) each of which is the holder of a claim against Miller that is not contingent as to liability or the subject of a "bona fide dispute as to liability or amount." 11 U.S.C. § 303(b)(1).

The Alleged Debtor has moved to dismiss the involuntary petition, arguing that the petition was, in fact, filed by just one entity (specifically arguing that all of the petitioning creditors are, in reality, alter egos or instrumentalities of a Mr. Barry Nussbaum) and, in any event, even if there are three or more entities involved, these entities' claims (which arise from an unstayed state court judgment that is on appeal) are the subject of a "bona fide dispute" as to the amount. The petitioning creditors (whom I will sometimes refer to as the "Nussbaum Entities") retort that the Alleged Debtor is barred by the doctrines of collateral estoppel and *Rooker-Feldman* from making an argument that there is essentially one entity as petitioning creditor, not three, because this issue was decided in connection with the unstayed state court judgment that is on appeal. Moreover, the Nussbaum Entities argue, only a creditor can argue alter ego type theories, and Miller does not claim to be a creditor of the Nussbaum Entities. The Nussbaum Entities also retort that one who holds an unstayed judgment (even if on

appeal) cannot be construed to be the holder of a claim that is the subject of a "bona fide dispute." The Nussbaum Entities' argument is, essentially, that if a judgment is **enforceable** under state law, then the judgment creditor can trigger an involuntary petition.

Thus, legal standing "Question # 1" before the court is whether the Alleged Debtor is estopped from arguing that the Nussbaum Entities are, in fact, one legal entity, not three (under either the collateral estoppel doctrine, the *Rooker-Feldman* doctrine, or because Miller is not a creditor of the Nussbaum Entities)?

Legal "Question #2," which the court must answer regardless of the answer to Question #1, is whether one who holds an unstayed judgment, even if on appeal, is, as a matter of law, the holder of a claim that is not the subject of a bona fide dispute as to liability or amount, or may a bankruptcy court go behind the judgment and find a dispute, and if so, does there appear to be a bona fide dispute here?

## II.  FACTS.

On April 27, 2004, the Nussbaum Entities entered into nine purchase and sale agreements with Orleans Properties, L.P., a single purpose entity set up by Miller's client, Mr. James Flavin.  These nine purchase and sale agreements pertained to several different apartment complexes, some in the Bachman Lake

area of Dallas, Texas; two in Fort Worth, Texas; one in Seagoville, Texas; one in Lake Jackson, Texas; and one in Houston, Texas, plus one office building in Houston, Texas. The purchase price was $94,665,000. The purchase and sale agreements were never consummated. As it turned out, Mr. Flavin grossly misrepresented his financial resources to consummate these purchase and sale agreements. Mr. Flavin was, apparently, a judgment-proof Massachusetts truck driver, representing himself to be a member of a wealthy East Coast family and the beneficiary of a $300 million trust fund. Later, after Mr. Flavin's amazing charade came to light, the Nussbaum Entities (plus eight other Plaintiffs—there were eleven Plaintiffs in all) sued Miller and Miller's agent (Mr. Steven Defterios), who had been representing Mr. Flavin, for fraud and negligent misrepresentation arising out of the failed transactions, seeking damages exceeding $30 million. This lawsuit was filed in 2006 in the 14th Judicial District Court of Dallas County, Texas. A jury eventually returned a verdict in favor of the Plaintiffs and, on December 1, 2008, the state court (Judge Mary Murphy) rendered a judgment against Miller and Mr. Defterios in the aggregate amount of $8,918,718.99. Miller and Mr. Defterios subsequently appealed the state court judgment, basically appealing only the damages, but not the liability, imposed by the judgment, and that appeal has been at least partially briefed, and is now pending before

the Court of Appeals for the Fifth District of Texas at Dallas. Meanwhile, during the pendency of this appeal, the Nussbaum Entities-specifically Dallas Clubview Gardens, L.P. (with a judgment claim of $493,397.24), Woodside Apartments L.P. (with a judgment claim of $1,185,568.72), and BNC Lake Jackson Village, L.P. (with a judgment claim of $263,145.23)—filed the involuntary Chapter 7 bankruptcy petition against Miller. Barry Nussbaum signed on behalf of all three Petitioning Creditors, indicating that he was President of the Managing Member of the General Partner of each of the Petitioning Creditors.

### III.  LEGAL ANALYSIS AND RULINGS.

### A.  One Entity or Three Entities as Petitioning Creditors?

With regard to legal standing "Question # 1," the court turns to the first argument of the Nussbaum Entities, that the doctrine of collateral estoppel bars litigation of the question of whether the Nussbaum Entities should be construed as one versus three entities, because there is a state court judgment that is essentially dispositive of the issue. The court concludes that the doctrine of collateral estoppel is inapplicable here.

In Texas, collateral estoppel applies where "(1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast

as adversaries in the first action." *Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta)*, 394 F.3d 347, 351 n.4 (5th Cir. 2004). Each condition must be met in order for collateral estoppel to apply. Three additional sub-factors are important in determining whether the facts of the first action were fully and fairly litigated: "(1) whether the parties were fully heard, (2) whether the court supported its decision with a reasoned opinion, and (3) whether the decision was subject to appeal or was in fact reviewed on appeal." *State Farm Fire and Cas. Co. v. Fullerton*, 118 F.3d 374, 382 (5th Cir. 1997). "[C]ollateral estoppel does not apply unless the issue presented was a 'critical and necessary part' of the prior judgment." *Copeland v. Merrill Lynch & Co., Inc.*, 47 F.3d 1415, 1423 (5th Cir. 1995).

Here the issue of whether the Nussbaum Entities are the alter egos of one another, or of Barry Nussbaum, does not appear to have been fully and fairly in the state court judgment, based on this court's review of the Final Judgment, Exh. AD-1, nor were the alter ego facts a "critical and necessary part of the judgment." In fact, the issue was of no concern to anyone, because the doctrine of alter ego is typically utilized to hold an ***owner*** of a business entity, or an affiliate of a business entity, liable for the debts of the business entity. No one was trying to hold Nussbaum or the Nussbaum Entities liable for any other business entity's debts in the state court litigation. The

state court litigation was all about Miller's and Mr. Defterios' potential liability to the Nussbaum Entities.

The court likewise concludes that the doctrine of *Rooker-Feldman* is inapplicable here. The *Rooker-Feldman* doctrine derives from two Supreme Court cases, one styled *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and the other styled *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), and has been interpreted as barring inferior federal courts from modifying, nullifying, or reversing state court judgments. "If a state trial court errs the judgment is not void, it is to be reviewed and corrected by the appropriate state appellate court." *Liedtke v. State Bar of Texas,* 18 F.3d 315, 317 (5th Cir. 1994). In essence, federal courts lack jurisdiction over collateral attacks on state court judgments unless a particular law provides otherwise. *In re Nazu, Inc.*, 350 B.R. 304, 311 (Bankr. S.D. Tex. 2006) (citing *Liedtke*, 18 F.3d at 317). An example of a particular law providing otherwise would be where a bankruptcy court is asked to vacate a state court judgment that violated a discharge injunction. *In re Bayhi*, 528 F.3d 393, 402 (5th Cir. 2008). Here, as earlier stated, the issue of whether the Nussbaum Entities are the alter egos of one another or of Barry Nussbaum was not fully and fairly litigated in the state court, based on this court's review of the Final Judgment, nor were the alter ego facts a "critical and

necessary part of the judgment."  Thus, Miller's raising of the
issue now (and this court's consideration of the issue) would not
rise to the level of lodging a review or attack on the state
court judgment.  The state court judgment simply never addressed
this issue.

        The court now turns to the harder question of Miller's
standing to raise the alter ego issues as a non-creditor of
Nussbaum or the Nussbaum Entities, and in the context of Section
303.

        In the *Sims* case, *In re Sims*, 994 F.2d 210, 220 (5th Cir.
1993), *cert. den'd sub nom. Sims v. Subway Equipment Leasing
Corp.*, 510 U.S. 1049 (1994), the Fifth Circuit was confronted
with similar arguments as the one made here—*i.e.,* whether and
under what circumstances a creditor-corporation, filing an
involuntary bankruptcy petition under Section 303, may be held to
be the alter ego of another and, thus, not considered to be a
requisite separate entity for filing purposes.  In the *Sims* case,
the alleged debtor was a franchisee operating four submarine
sandwich shops, and the three petitioning creditors all held
separate claims against the debtor, based on subleases and
equipment leases.  This is similar to the Nussbaum Entities in
the case at bar.  The Nussbaum Entities' Final Judgment clearly
gives the Nussbaum Entities three separate claims in separate
amounts based on their separate damages claims presented to the

jury and trial court. In *Sims*, the alleged debtor made the argument that the ultimate franchiser, who was an affiliate of the three petitioning creditors, was really the alter ego of all three petitioning creditors and, thus, the court should deem there to be but one petitioning creditor, not the requisite three needed, since the alleged debtor had more than twelve creditors. The Fifth Circuit reversed the district court's application of the alter ego theory to treat the petitioning creditors as one creditor (the district court had reversed the bankruptcy court on this issue).

In analyzing the issue, the Fifth Circuit noted that the Bankruptcy Code is silent regarding whether, and under what circumstances, the separate identity of a corporate creditor should be disregarded for Section 303(b)(1) purposes. *Id.* at 215. Moreover, the Fifth Circuit had not been able to find any case in which the corporate identity of a petitioning creditor had been disregarded (although the court did find and discuss certain cases where the corporate identity of a petitioning creditor had been **challenged**). Significantly, the Fifth Circuit observed that "the legal principles for disregarding a corporation's separate identity have been applied primarily in situations in which a creditor or other party seeks to use them as a sword to impose liability on the owners of a corporation. They may have limited utility under § 303, when a debtor is

attempting to use them as a shield, to avoid involuntary bankruptcy." *Id.* at 217 n.8.  In any event, without making a holding as to the possible ***inapplicability*** of the alter ego concept in connection with Section 303, the Fifth Circuit ultimately reversed the district court's application of alter ego to the petitioning creditors in *Sims*.  The Fifth Circuit started by noting that each of the three petitioning creditors held separate claims based on separate contracts.  The court then assumed that ordinary principles of corporation law governing the disregard of corporate entities should apply.  The court did not determine whether state or federal common law should be utilized in the Section 303 context (the court observing that Connecticut and Delaware state law—which were applicable to the corporations in *Sims*—were "substantially identical" to federal common law, and thus there was no need to determine this).  *Id.* at 218 n.11 (and various citations therein).  The Fifth Circuit went on to note that it was critical to determine whether the claims involved sounded in contract or tort, because in contract cases, fraud is an essential element of an alter ego finding.  *Id.* at 218 n.11. Once again, the court had to confront the unusualness of applying the alter ego theory in the context of Section 303, stating: "Here, there is no attempt by the debtors to hold DAI  [who was the alleged alter ego of the petitioning creditors] liable for any debts owed them by the creditors—indeed, the only claims that

are relevant in determining the creditors' qualifications under § 303(b)(1) are those of the creditors against the debtors. Those claims are based on contracts:  the subleases and equipment leases for the four franchises.  DAI is not a party to those contracts.  . . . The debtors have not alleged, nor is there any evidence, that SEI, SRI, or SSS were established for fraudulent purposes, or for the purpose of subverting the three creditor requirement" nor had the debtors alleged that they were fraudulently induced to enter into the contracts.  *Id.* at 219. Thus, in the absence of any finding of fraud, the Fifth Circuit held that the district court had erred in applying the alter ego doctrine.

This court, like the Fifth Circuit in *Sims*, struggles somewhat with the idea of applying an alter ego analysis to petitioning creditors such as the Nussbaum Entities, when the Alleged Debtor is not itself owed any money by Nussbaum or the Nussbaum Entities, and is not attempting to pierce their corporate veils to hold affiliates or a parent liable for amounts **owed to Miller**.  Section 303, at first blush, seems like a strange and backwards context in which to be utilizing alter ego theories.  But this court holds that an alleged debtor—here Miller—**does** have standing to challenge the separate identity of the Petitioning Creditors, even though the Alleged Debtor is not a creditor of Nussbaum or the Nussbaum Entities.  First, as noted

earlier, the *Sims* court confronted the reality that "the legal principles for disregarding a corporation's separate identity have been applied primarily in situations in which a creditor or other party seeks to use them as a sword to impose liability on the owners of a corporation." *Sims*, 949 F.3d at 217 n.8. And the Fifth Circuit went on to say that the alter ego principles "may have limited utility under § 303, when a debtor is attempting to use them as a shield, to avoid involuntary bankruptcy." *Id.* And yet, the Fifth Circuit, when confronted with the issue, did not explicitly reject the notion that an alleged debtor could raise the issue as to his petitioning creditors. Thus, by implication, the Fifth Circuit has held that alleged debtors can challenge the separateness of petitioning creditors through alter ego type theories.

Last but not least on this topic, the court cites Judge Friendly's dissenting opinion in the *Gibraltor* case as being solid and enlightening authority explaining the policy behind the three-creditor requirement. *In re Gibraltor Amusements, Ltd.,* 291 F.2d 22 (2d Cir. 1961). Judge Friendly explains the very contentious history that the involuntary bankruptcy remedy had, even under prior bankruptcy statutes, and that, out of concern that a single creditor could use an involuntary case as a weapon that might harass or even destroy a debtor, there was a hard fought battle in Congress that resulted in a requirement that

there be three real creditors, separate in reality and not form. *Id.* at 28. In summary, this court holds that an alleged debtor does have standing to probe into the separateness of his three petitioning creditors. Thus, the Nussbaum Entities' Motion to Strike the portion of Miller's Motion to Dismiss challenging whether the Nussbaum Entities are three separate petitioning creditors, is denied. Miller may take discovery on this fact question and present its evidence at the trial on the involuntary petition.

## B.    Bona Fide Dispute.

Finally, this court will address the "bona fide dispute" issue:  whether one who holds an unstayed judgment, even if on appeal, is, as a matter of law, the holder of a claim that is not the subject of a bona fide dispute as to liability or amount, or may a bankruptcy court "go behind the judgment" and find a bona fide dispute, and if so, does there appear to be a bona fide dispute here?

As noted by counsel for the Nussbaum Entities, there are many courts that have held that an unstayed judgment (even if on appeal) is not the subject of a bona fide dispute, for purposes of Section 303(b). Indeed, it is without a doubt, the majority view. *See, e.g., In re Drexler*, 56 B.R. 960 (Bankr. S.D.N.Y. 1986); *In re Caucus Distrib., Inc.*, 83 B.R. 921 (Bankr. E.D.Va. 1988); *In re Euro-American Lodging Corp.*, 357 B.R. 700 (Bankr.

S.D.N.Y. 2007); *In re Huggins*, 380 B.R. 75 (Bankr. M.D. Fla. 2007); *In re C.W. Mining, Co.*, 2008 WL 4279635 (Bankr. D. Utah 2008) (not reported in B.R.).  In this court's opinion, all of the courts that conclude that an unstayed judgment (even if on appeal) is not a claim that is the subject of a bona fide dispute seem to conflate the concept of "enforceable judgment" with the concept of there being a claim that is not subject to a bona fide dispute.  In other words, if a creditor has an enforceable judgment, then he ought to be able to commence an involuntary petition against his judgment creditor—among his various other state law remedies of enforcement.  The question in this court's mind: Is this conflation correct?  And what, if anything, was the 2005 amendment of Section 303(b)(1) intended to accomplish?[1]

First, the court believes it is pertinent to note the Bankruptcy Code's definition of "claim" at Section 101(5).  It is a broad definition:  "right to payment, **whether or not it is reduced to judgment**, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured, or unsecured" (emphasis added), also, "a right to an equitable remedy for breach of performance if such breach gives

---

[1] The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") amended Section 303(b)(1) of the Bankruptcy Code to add the words "as to liability or amount" after the words "bona fide dispute," so that now the petitioning creditors' claims must not be the "subject of a bona fide dispute **as to liability or amount**."  11 U.S.C. § 303(b)(1) (emphasis added).

rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment . . .." Moving from Section 101(5) to Section 303(b), Section 303(b) indicates that it is not enough merely to hold a Section 101(5) claim against the alleged debtor to commence an involuntary petition. It has to be a certain kind of claim: one more narrow than that defined in Section 101(5); it has to be a claim not the subject of a ***bona fide dispute as to liability or amount***. However, unfortunately, the Bankruptcy Code does not define "bona fide dispute as to liability or amount." In the face of there being no codal definition, the Fifth Circuit held in *Sims* (a case decided before the 2005 Bankruptcy Code amendments) that one measures "bona fide dispute" by an ***objective*** yard stick. *Sims*, 994 F.2d at 220-21.

The Fifth Circuit in *Sims* elaborated that a petitioning creditor has the burden of proof of establishing a prima facie case that no bona fide dispute exists with respect to its claim. Then, the burden shifts to the alleged debtor to present evidence demonstrating that a bona fide dispute exists. *Id.* at 221. Presumably, having a judgment goes a long way toward establishing a claim not subject to a bona fide dispute. *In re Byrd*, 357 F.3d 433, 438 (4th Cir. 2004) (finding that "judgments go a long way toward establishing the absence of a bona fide dispute" and that "it will be the unusual case in which a bona fide dispute exists in the face of claims reduced to state court judgments"). (Note

that *Sims* did not involve a petitioning creditor with a judgment.)  **So the question is whether an unstayed judgment (even if it is on appeal) essentially creates an irrebuttable presumption of no bona fide dispute?  In other words, is there anything an alleged debtor can do, from a proof-standpoint, to present evidence of a bona fide dispute as to liability or amount when there is an unstayed judgment?**

Most courts essentially hold no.  *See, e.g., In re Drexler*, 56 B.R. 960 (Bankr. S.D.N.Y. 1986); *In re Caucus Distrib., Inc.*, 83 B.R. 921 (Bankr. E.D.Va. 1988); *In re Euro-American Lodging Corp.*, 357 B.R. 700 (Bankr. S.D.N.Y. 2007); *In re Huggins*, 380 B.R. 75 (Bankr. M.D. Fla. 2007); *In re C.W. Mining, Co.*, 2008 WL 4279635 (Bankr. D. Utah 2008) (not reported in B.R.).  *See also In re Smith*, Bankr. Case No. 09-30531-HDH-7 (Bankr. N.D. Tex. Sept. 3, 2009) (Hale, J.).  But this court views this, first, as arguably inconsistent with the literal wording of the statute. The statute could have referred to holders of judgments in Section 303(b), but, instead, Section 303(b) uses a more amorphous and flexible concept, by referring to claims "not the subject to a bona fide dispute as to liability or amount." Again, the Fifth Circuit in *Sims*, indicated that an objective standard should be used in analyzing whether there is a bona fide dispute—in other words, courts should not simply rely on the subjective beliefs of the alleged debtor that the debt is in

dispute.  But what does applying an objective standard mean?  The
"objective standard" in the law has historically meant using the
hypothetical "reasonable man" standard.  So, in this court's
view, there has to be some analysis of what the post-judgment
circumstances are.  ***It would be "unobjective" or not "reasonable"
to simply stop, upon learning that there is an unstayed judgment.***
Do we conflate the concepts of enforceable judgment with no bona
fide dispute?  Many courts would say yes.  Maybe this was the
intention of Congress–*i.e.,* if you can enforce an unstayed
judgment with state law remedies, such as seizing property and
whatnot, then you ought to be able to enforce it by filing an
involuntary bankruptcy case.  But these are not the words
Congress used.  Congress generally downplayed the significance of
there being a judgment in stating whether a creditor holds a
claim.  Again, see Section 101(5) where the irrelevance of having
a judgment is referenced.

In reconciling all the authority on this (including the
court's own authority in *In re Briggs*, 2008 WL 190463 (Bankr.
N.D. Tex. 2008)), this court holds as follows.  ***Generally***, an
unstayed judgment should not be deemed to be the subject of a
"bona fide dispute" as to liability or amount, even if it is on
appeal.  However, the existence of an unstayed judgment, in this
court's view, should not ***preclude*** the inquiry into whether a bona
fide dispute exists as to the amount or validity of a claim.  In

other words, an unstayed judgment does not create an irrebuttable presumption of no bona fide dispute, just a presumption. If there are objective circumstances that might give rise to a bona fide dispute as to liability or amount (*e.g.,* perhaps a default judgment where facts were not actually litigated; perhaps a judgment inadvertently entered against a non-party; perhaps where subsequent events cast doubt upon the judgment's enforceability, such as due to a payment of the judgment debt or posting of a bond, or even some sort of appellate court holding in another case that changes the law and suggests it is inevitable that the unstayed judgment will be reversed), then having an unstayed judgment may not pass muster under Section 303. The *Briggs* case that this court decided was different from this case, and the court was justified, in this court's view, in deviating from the general rule. *Briggs* did not involve a multi-day jury trial. *Briggs* involved real questions as to whether one debtor (the individual debtor) had even been a party in the state trial court and/or a settlement and correctly named as a judgment debtor. *Briggs* involved genuine, meaningful disputed questions as to whether the corporate debtor had paid certain amounts under a prior settlement agreement that were not acknowledged in the state court. *See In re Briggs* at *1-*2.

To be clear: An appeal alone does not create a bona fide dispute. But a highly specialized fact pattern can conceivably

guide a court to make an exception to the general rule recognizing the finality/enforceability of an unstayed judgment. *See In re Prisuta*, 121 B.R. 474 (Bankr. W.D. Pa. 1990) (where petitioning creditor's claims were based on a default judgment and a confession of judgment, the court found that the pendency of an appeal of the judgment was significant and that the default judgment left open substantial questions regarding the debtor's liability; thus judgment creditor's claim was the subject of a bona fide dispute). *See also In re Byrd*, 357 F.3d 433 (4th Cir. 2004).[2]

In any event, here, the court finds no highly specialized fact pattern, like in *Briggs*, to make an exception to the rule that, where there is an unstayed judgment (even if on appeal) there is no bona fide dispute. Here, there was a full jury trial, a multi-day trial, with active participation by the

---

[2] *But see In re Norris*, 114 F.3d 1182 (5th Cir. 1997), *cert. denied,* 522 U.S. 935 (1997) (unpublished case in the Section 303 context in which Fifth Circuit held that claim arising from an unstayed judgment was not the subject of a bona fide dispute, but which Fifth Circuit indicated had no precedential value). Even if *Norris* did have precedential value, this court does not view the *Norris* holding to be inconsistent with this court's ruling here, because *Norris* did not involve any specialized fact pattern. Moreover, the Fifth Circuit noted that, by the time that the Fifth Circuit had before it the Section 303(b) questions, all appeals by the Debtor had been exhausted and were unsuccessful. This court cannot help but wonder if this, combined with the fact that the alleged debtor was a bad actor—a lawyer who confessed to burning $500,000 of currency and who had done jail time—were factors in the Fifth Circuit writing a very short opinion that they did not want to have precedential value, quickly dismissing the notion of there being any bona fide dispute with regard to the unstayed judgment.

Alleged Debtor and litigation of all facts and law. There is not the same risk of a creditor abusing the bankruptcy process as there is in a case where there has been a default judgment or some sort of obvious mistake with the judgment, such as naming a non-party as a liable party. So here, the court concludes that the Motion to Dismiss must be denied as to the standing of the Nussbaum Entities. The court concludes that the fact that the Nussbaum Entities have an unstayed judgment, that was tried with participation by Miller and has no patent irregularities on its face, means that the Nussbaum Parties are holders of claims not the subject of a bona fide dispute. The court has looked at the appellate briefs. Indeed, there are genuine issues that could go either way on appeal. But this court's holding in *Briggs* should not be construed to mean that this court views its role in probing into the details of the judgment as being a forecaster or odds-maker on the appeal. It is simply about looking, in an objective and unobtrusive way, at the judgment and circumstances, and determining if there is something so irregular about the unstayed judgment that any reasonable person would consider there to be a bona fide dispute as to liability or amount.

Last but not least, back to the question of the relevance of the amendment to Section 303(b)(1) in BAPCPA in this context.[3]

_____

[3]Most of the published opinions that discuss the bona fide dispute issue pre-date the 2005 BAPCPA amendments. Of those opinions that post-date BAPCPA, this court could find only two which address the relevance, if any, of the amendment to the bona

The court concludes that the amendment to Section 303(b)(1) has minimal relevance in the context of a final, unstayed judgment. Yet, the amendment cannot be ignored. It did something. It has *some* significance. It appears to this court that the amendment at least clarified, and perhaps even expanded the universe of when is there a "bona fide dispute" with regard to a claim. Now, it is clear that a claim is the subject of a bona fide dispute if *either* the liability itself is in dispute or merely the amount is in dispute. If nothing else, this signals that Congress continues to caution that holders of questionable claims ought not to be allowed to force companies into bankruptcy against their will. But, again, even under the new statute, the Nussbaum Entities with their unstayed judgment, that is not fraught with some sort of obvious irregularity, passes muster.

---

fide dispute language. *In re C.W. Mining, Co.*, 2008 WL 2479635 (Bankr. D. Utah 2008), which found, similarly to this court, that courts must now "determine whether there is an objective basis for either a factual or legal dispute as [to] the amount or the liability of the petitioning creditors' claims." *Id. In re Euro-American Lodging Corp.*, 357 B.R. 700 (Bankr. S.D.N.Y. 2007), which opined that the 2005 amendment "presumably" eliminated the second part of the old test for when a dispute as to the amount of the claim gives rise to a bona fide dispute. The old test being that a dispute as to the amount of the claim would give rise to a bona fide dispute only when (1) the dispute does not arise from a wholly separate transaction and (2) netting out of the claims of the debtor against the petitioning creditor could take the petitioning creditors below the amount threshold for section 303. *Id.* at 711 n. 8.

## IV.   CONCLUSION.

The court will hold a trial on **October 28, 2009, at 9:30 a.m.**, and will hear evidence on the contested factual questions concerning:  (a) whether the Nussbaum Entities are, in reality, one versus three petitioning creditors; (b) whether the Alleged Debtor is or is not generally paying its debts as they become due; and (c) whether abstention pursuant to Section 305 is appropriate.

**IT IS SO ORDERED.**

***END OF MEMORANDUM OPINION***