Stephanie D. Curtis
  Texas State Bar  No. 05286800
Mark A. Castillo
  Texas State Bar  No. 24027795
Zac Copp
  Texas State Bar  No. 24042750
THE CURTIS LAW FIRM, PC
901 Main Street, Suite 6515
Dallas, Texas  75202
Telephone: 214.752.2222
Facsimile: 214.752.0709

PROPOSED COUNSEL FOR DEBTOR
AND DEBTOR-IN-POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE § | | |
| § | | |
| HENRY S. MILLER § | Case No.  09-34422-SGJ-11 | |
| COMMERCIAL, LLC, § | | |
| § | | |
| Debtor. § | | |
| § | | |

**DEBTOR'S RESPONSE TO PETITIONING CREDITORS'**
**MOTION FOR AN ORDER CONVERTING CASE TO CHAPTER 7**

TO THE HONORABLE STACEY G. JERNIGAN
UNITED STATES BANKRUPTCY JUDGE:

    Comes now Henry S. Miller Commercial, LLC ("HSMC" or "Debtor"), Debtor-in-Possession in the above-captioned case and files this Response (the "Response") to the Motion (the "Motion") for an Order Converting Case to Chapter 7, and in support hereof, would respectfully show the following:

### I.  INTRODUCTION

**The series of events precipitated by the Petitioning Creditors is now being utilized by them to cry foul at results in the Debtor's business operations they themselves created.  After obtaining a large judgment against the Debtors, the Petitioning**

---
**DEBTOR'S RESPONSE TO MOTION FOR AN ORDER CONVERTING CASE TO CHAPTER 7**

**Creditors publicized the results in a self aggrandizing fashion, which caused the Debtor's customers, bankers and brokers to pause and even curtail their business with the Debtor – now, these same braggarts are complaining because the Debtor's operations have diminished and would even go so far as to try and convince this Court to believe it was due to the Debtor's "gross mismanagement" and "needs to be investigated." It is painfully obvious why the Debtor's operations have dwindled – the Petitioning Creditors devalued the enterprise through self-applauding publicity of their approximate $9 million judgment against the Company. Nevertheless, the Debtor still has assets and can provide value for creditors, and is striving to maximize a return through this Chapter 11 process- despite the Petitioning Creditors' continued attempts to destroy any remaining value in the enterprise. This whole exercise is nothing more than a clumsy attempt by the Petitioning Creditors to try and reach the assets of other non-judgment Debtor affiliates. The Petitioning Creditors' tortious plan must fail.**

## II. JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. Consideration of this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III. PROCEDURAL BACKGROUND

2. On July 7, 2009 (the "Petition Date"), the bankruptcy case (the "Bankruptcy Case") was commenced by the filing of an Involuntary Petition for Relief (the "Involuntary Petition") under Chapter 7 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") by three of the Debtor's alleged creditors (collectively, the "Petitioning Creditors"), those being BNC Lake Jackson Village, L.P. ("BNC"), Dallas Clubview Gardens, L.P. ("DCG") and Woodside Apartments, L.P. ("Woodside").

3. Subsequently, after over six (6) months of litigation concerning the entry of an order for relief, an agreement was reached with the Petitioning Creditors whereby the Debtor would agree to the entry of an order for relief so long as its case was converted from Chapter 7 to one under Chapter 11 of the Bankruptcy Code.

4. On December 17, 2009, the Court entered an Agreed Order for Relief in an Involuntary Case (the "Agreed Order"), wherein the parties agreed to entry of an order for relief ("Order for Relief") and the conversion of the case from Chapter 7 to Chapter 11 [Docket No. 55].

5. The Debtor's Bankruptcy Case has not been converted under sections 1112, 1208, or 1307 of the Bankruptcy Code, and no trustee, examiner or committee of unsecured creditors has been appointed.

6. On February 19, 2010 the Debtor filed its Application (the "Application") to Employ The Curtis Law Firm, PC ("TCLF") to represent the Debtor in connection with the Bankruptcy Case. Also on February 19, 2010, the Debtor filed a Motion to Establish Procedures for Interim Compensation and Reimbursement of Professionals ("Motion for Interim Compensation Procedures"). The Application and Motion for Interim Compensation Procedures are both set to be heard on an expedited basis on February 26, 2010 at 9:30 a.m.

7. On February 23, 2010, the Debtor filed its Application to Employ Ordinary Course Professionals as Other Professionals ("Ordinary Course Professionals Application") requesting an order to employ and retain Geary, Porter & Donovan, PC ("GPD"), Shields, Britton & Fraser, PC ("SBF"), Strasburger & Price, LLP ("S&P"), and Shannon, Gracey, Ratliff & Miller, LLP ("SGRM") to provide legal services to the Debtor in connection with the pending litigation, appeals, insurance coverage, and as corporate counsel. (TCLF, GPD, SBF, S&P and SGRM are referred to hereinafter collectively as the "Firms" or individually from time to time as "the Firm" or "a Firm").

## IV.  FACTUAL BACKGROUND

8. The Henry S. Miller Company was established in 1914 and has forged a widely-known tradition of service and integrity in Texas for over 85 years. In March 1994, the well-respected Miller family announced the formation of Henry S. Miller Commercial Co., a full service real estate company to serve the commercial needs of its clients and embrace the expanding commercial real estate market. Effective January 1, 2007, Henry S. Miller Commercial Co., became known as Henry S. Miller Commercial, LLC, in accordance with the provisions of Article 5.17 of the Texas Business Corporation Act and Section 10.101 of the Texas Business Organization Code.

The Judgment

9. In 2006, the Petitioning Creditors, along with six (6) other plaintiffs, commenced a lawsuit against HSMC and others in the District Court of Dallas County, Texas in the 14th Judicial District, Cause 06-12902-A (the "Lawsuit") seeking damages in excess of $30 million. Upon the filing of the Lawsuit, HSMC tendered the claim to its insurance carrier, Diamond State Insurance Company ("Diamond State").  Pursuant to a reservation of rights, Diamond State agreed to provide a defense and appointed Steven K. Terry ("Terry") from the law firm of Newsom, Terry & Newsom, LLP ("Newsom") to defend the Lawsuit.

10. On October 24, 2008, at the conclusion of the trial in the state court Lawsuit, a $12 million damage award was rendered in favor of plaintiffs.  On December 1, 2008, the trial court entered final judgment in the Lawsuit in the amount of $8,918,719.99 (the "Judgment").

The Appeal

11. Upon entry of the Judgment, the Debtor immediately perfected its right to appeal, thus the Judgment is on appeal in the Court of Appeals for the Fifth District of Texas at Dallas, No. 5-08-01726-cv (the "Appeal"). The Debtor hired P. Michael Jung and Strasburger & Price, LLP to prosecute the Appeal. Opening briefs were filed by the parties to the Appeal prior to the stay of the appeal as a result of the commencement of the Bankruptcy Case by the Petitioning Creditors. After many months into the Bankruptcy Case, the Debtor obtained an agreed order granting relief from the automatic stay, which was entered on December 17, 2009 [Docket No. 54]. However, there is still a stay in place by virtue of the appellate rules of procedure. While a motion has been prepared to be filed in the appellate court to allow the appeal to move forward so that responsive briefs can be filed and the matter set for oral argument by Debtor's appellate counsel, same counsel is awaiting approval by this Court on Debtor's Ordinary Course Professionals Application.

12. Of course, Petitioning Creditors objected to the Debtor setting its Ordinary Course Professionals Application for hearing on an expedited basis and furthermore, submitted they intended to object to the approval of the Application. Thus, the Petitioning Creditors are attempting to hamper the Debtor's attempt to zealously and swiftly prosecute the Appeal. Jung is being compensated by the Debtor's insurance company and as such, Petitioning Creditors have no basis whatsoever to oppose Jung's performance of these much needed legal services for the Debtor, except that the services entail continuing to facilitate judicious resolution of the Appeal and those services would be to their detriment. As such, their opposition, just like the allegations in the Motion, are not asserted in good faith and are not in the best interests of the estate.

The Coverage Litigation

13.　On January 15, 2009, Diamond State delivered a letter to the Debtor stating it was exercising its reservation of rights and denying the Debtor's request for indemnity under the insurance policy. Diamond State also filed a declaratory judgment action in federal court which was later dismissed seeking to deny coverage. On February 4, 2009, in response to Diamond State's attempt to deny coverage, the Debtor filed a lawsuit seeking insurance coverage in the 101st Judicial District, in the District Court of Dallas County, Texas (the "Coverage Litigation") against Diamond State, Newsom and Terry alleging, *inter alia*, negligence and malfeasance in the handling of the underlying claim and the underlying lawsuit which resulted in the Judgment. Stanley has joined as a party-plaintiff to this litigation on behalf of the Petitioning Creditors.

14.　The current status of the Coverage Litigation, which has been pending for over one year, is that it is deeply entrenched in discovery disputes, with several motions to compel and for protective orders pending. The case is being heavily and aggressively litigated by both sides. Out of state defendants will be joined and deposed in the action. Trial is set for January 2011.

The Damaging Publicity

15.　After the filing of the Lawsuit, but Prior to entry of the Judgment, counsel for Petitioning Creditors launched a political campaign to destroy the name and image of "Henry S. Miller" and the Debtor and its business, and has continued to do so. Among other negative press, in December of 2007, Marc Stanley ("Stanley") participated in a ten (10) page article published in D Magazine that was purposefully unflattering and not at all times correct about the

---
DEBTOR'S RESPONSE TO MOTION FOR AN ORDER CONVERTING CASE TO CHAPTER 7
Page 6 of 18

Debtor and its former agent, Defterios, also a named defendant and party with involvement in the transactions that formed the basis of the Lawsuit.

16. Later, after the damage award, Stanley purchased a large ad in the *Texas Lawyer* advertising his so-called victory against HSMC. Additionally, Stanley issued several press releases across several local and national syndicates announcing the details of his firm's attack on the Debtor.

17. Based on the bad publicity made known by and with the cooperation of the Petitioning Creditors, HSMC's business began to suffer. Its customers for whom it managed substantial projects became concerned and voiced those concerns to the Debtor's brokers and management. Its brokers, too were concerned. Since the brokers work on a commission basis they were concerned in two major ways: (i) would their commission checks be caught up in collection actions by the Judgment plaintiffs, and (ii) would their existing customers move their business and/or would they be handicapped from obtaining new contracts and customers due to the bad publicity caused by the results of the Judgment. Maintaining brokers is integral to any commercial real estate business, and the Debtor's brokers were growing antsy due to calls from competitors and customers concerned over the Judgment and threatening to leave. Finally, the Debtor's bankers became concerned with the creditworthiness of the Debtor based on the existence of this large contested liability and refused to continue to provide much needed lending to the Debtor's operations. <u>In sum, it was the actions of the Petitioning Creditors themselves that caused the Debtor's operations and profitability to dwindle pre and postpetition.</u>

The Debtor's Loans Were Now in Default

18. As is customary under typical commercial loan documentation, the rendering of the approximate $9 million Judgment understandably placed the Debtor in default pursuant to the default provisions regarding a "material adverse change in Borrower's financial condition" under its existing loan documents with its lender, Regions Bank ("Regions").

19. On April 10, 2007, the Debtor and Regions entered into a $ 1 million Promissory Note with a maturity date of April 10, 2008, which was to act as a revolving line of credit secured by the Debtor's accounts receivable, business furnishings, equipment and fixtures (the "Collateral") as described in the Security Agreement (the "Security Agreement") of even date. The purpose of the revolving line of credit was to fund the Debtor's operational costs including overhead and other expenses during cyclical downturns, and to provide funding for costs associated with the provision of brokerage, property management and appraisal services prior to the receipt of commissions and fees, for which there is a significance lag. With regard to the Debtor's brokerage business, funding was necessary to pay office personnel and other operational and overhead items in down cycles and prior to receipt of commissions; with regard to the Debtor's property management subsidiary, funding was needed to advance monies for payroll and other expenses to on-sight management personnel prior to billing its customers and receiving the property management fees; with regard to the appraisal services provided through another of the Debtor's subsidiaries, funding was also necessary for costs which were also advanced to the appraisers prior to receipt of payment for same from the customer. Thus, the line of credit was essential to the Debtor's day-to-day operations including proper management of its own business as well as that of its subsidiaries.

20. On June 1, 2008, based on economic factors affecting the real estate industry generally, the Debtor and Regions amended and restated the Note, increasing the revolving line of credit to $1.5 million and extending the maturity date until June 1, 2009.

21. In October of 2008, the Debtor owed approximately $ 1 million to Regions under the Note. Due to the enormity of the damage award obtained by Petitioning Creditors, the Debtor and Regions thereafter commenced discussions regarding Regions rights under the Note to declare the indebtedness due and payable without notice, and the Debtor's need to restructure the debt. It was determined by Regions that it would not immediately declare the indebtedness under the Note due and payable and foreclose on its Collateral, which would have put the Debtor out of business, but instead desired to enter into a modification agreement.

22. Henry S. Miller Realty Services, LLC ("Realty Services") was created on October 29, 2008, and in connection with the modification agreement, agreed to execute a guaranty agreement guaranteeing the performance of the Debtor under the Note in exchange for Regions entering into a new loan with Realty Services. It was agreed that the maturity date of the Note would be extended until September 1, 2009, and at such time it would be due and payable. The terms of the modification agreement were ultimately finalized after several months and reduced to writing, and executed by the parties on or about June 30, 2009 (the "Modification Agreement"). In connection with the arrangement to restructure the indebtedness under the Note, as is typical to most work-out agreements, the Modification Agreement at paragraph 21 contained a limited release in connection with any and all claims, demands, liabilities, losses or causes of action borrower may have against lender relating to the loan, the loan documents or agreements.

23. As part of its restructuring efforts, and in furtherance of the fulfillment of its duties to the Debtor, Debtor's management approached other lenders to attempt to obtain alternative financing sources on more favorable terms. One such lender approached by the Debtor was Mutual of Omaha Bank. However, due to the Judgment, Mutual of Omaha Bank declined to extend credit to the Debtor. The Debtor was thus not able to locate alternative financing sources due to the acts of the Petitioning Creditors, *inter alia*, the Judgment and then the commencement of the Bankruptcy Case.

24. In accordance with the arrangements with Regions, Realty Services executed a loan agreement and promissory note (the "Realty Note") in the amount of $1 million, which was to act as a revolving line of credit secured by the Realty Services accounts receivable, business furnishings, equipment and fixtures (the "Realty Collateral") as described in the Security Agreement (the "Realty Security Agreement") of even date. Upon execution of the Note, Regions provided Realty Services an advance of $745,000.00. Based on various notes payable to the Debtor by a subsidiary of Realty Services, entered into from January 2009 through June 30, 2009, on July 1, 2009 Realty Services advanced $745,000 to pay down the indebtedness to the Debtor under those notes. The Debtor, then in turn, remitted those proceeds to Regions to pay down the amount of the existing indebtedness under its defaulted Note. After this reduction in the indebtedness, the Debtor owed a remaining balance of approximately $255,000 to Regions under the Note.

25. The Debtor was unable to satisfy the remaining $255,000 of indebtedness under the Note on its renegotiated maturity date of September 1, 2009. And due, *inter alia*, to the involuntary bankruptcy proceedings commenced by the Petitioning Creditors, Regions was unwilling to extend further the maturity date of the Note and the Debtor was unable to find an

alternative source of financing. Regions did then assign its note and liens to Realty Services, and on or about October 30, 2009 pursuant to that certain Assignment of Note and Liens (the "Assignment"), Realty Services purchased Region's Note for $255,000.

26. The Debtor has made no payments to Realty Services under the assigned Regions Note. However, Realty Services has paid the Debtors approximately $181,000 since the Petition Date on the various notes payable.

The Chapter 11

27. To add to the business struggles the Debtor had been facing due to the Lawsuit, news articles regarding the Bankruptcy Case commenced by the Petitioning Creditors were published by Stanley throughout the land from July 2009 until December 2009, when after six (6) months of litigation in the Bankruptcy Court, the Debtor agreed to an Order for Relief and conversion of the case to Chapter 11.

28. Needless to say, customers, brokers and lenders became even more nervous as a result. Nevertheless, and despite this obvious downturn in the Debtor's prepetition business due to the events precipitated by the Petitioning Creditors themselves, the Motion alleges in nothing more than a conclusory fashion, that the Debtor's management – whom have enjoyed impeccable business reputations for several decades – have suddenly displayed questionable practices, to the extent current management needs to be removed. This argument must fail.

29. The Petitioning Creditor's Motion is chalked full of false information, namely that the Debtor's gross income declined from $10.7 million in 2008 to $1.17 million in 2009, blaming the existence of Realty Services and its subsidiaries. Realty Services and its subsidiaries did nothing more than provide critical assistance to the Debtor in stabilizing its circumstances with its lender after entry of the Judgment. This is deceptively false and misleading information in

numerous ways. First, Petitioning Creditor's incorrectly cite the information reported by the Debtor in its SOFA, Question No. 1, in that the gross income number reported for the Debtor for 2009 was for the period of January 1, 2009 through July 7, 2009, only, and was not an annual number as represented by them. Second, Petitioning Creditors fail to also state that Debtor's gross revenue declined from $17.5 million in 2007 to $10.7 million in 2008 due to nation-wide economic factors affecting the real estate industry, thus dropping by almost 40%. And finally, it is important to mention that real estate services nationwide have dropped down to nearly the lowest levels in history in 2009 and continue to decline, and as such, Realty Services and its subsidiaries simply could not alone have been the reason for the Debtor's declining revenue[1].

## V. THE DEBTOR'S RESPONSE

The Debtor's Plan

30. Contemporaneously with the filing of this Response, Debtor is filing its Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code, and accompanying proposed Chapter 11 Plan of Reorganization ("Plan"). Under the Debtor's Plan, creditors of the Debtor's estate shall receive substantially more than they otherwise would in a chapter 7 liquidation. To wit, the Debtor's largest and most significant asset is the Coverage Litigation, where it seeks (i) damages for denial of coverage under its Errors and Omissions policy carried by Diamond State; and (ii) recovery from Diamond State and from the malpractice carrier for Terry and Newsome based on claims of malfeasance and malpractice for the mishandling of the litigation. The Debtor is seeking in excess of $30 million in the Coverage Litigation and believes the value to the estate

---

[1] Realty Services only grossed $1.4 million for the same period of January 1, 2009 through July 7, 2009. Simply put, revenues that existed in the real estate services industry in 2007 and 2008 simply do not exist anywhere, now.

to be much higher if the Debtors are allowed to remain in control of its prosecution.[2]  Petitioning Creditors cannot deny the value of this litigation as they too, have joined as party-plaintiffs!

31. In addition to the litigation recoveries, which will be assigned to creditors under the Plan, it is anticipated the Plan will be further funded by a cash infusion of approximately $500,000 from Realty Services, to purchase the stock of the Debtor at confirmation.  With this money available to fund its Plan, plus proceeds from the collection of the Realty Services receivable with a net amount outstanding of $582,480.00.87, and potential other recoveries of approximately $135,000 to $185,000, total assets potentially available for creditors is predicted to be several millions of dollars.  The Debtor believes its Plan has a reasonable likelihood of success.

Conversion is Not in the Best Interest of the Creditors

32. It is not in the best interest of the creditors and the Debtor's estate for the Bankruptcy Case to be converted to Chapter 7 and a Chapter 7 Trustee appointed to handle the Debtor's affairs, and unusual circumstances exist to deny the Motion.

33. If the Debtor's is not given a chance to propose its Plan, and instead, the Court converts the Bankruptcy Case to one under Chapter 7 of the Bankruptcy Code, then creditors will be harmed in the following ways.  The Debtor and its professionals who have been working on the Coverage Litigation for over one year, will be replaced with a Chapter 7 trustee and his or her professionals, neither of whom will have any background, knowledge or experience regarding the facts, claims or evidence necessary to successfully pursue the Coverage Litigation. Bringing a chapter 7 trustee and new counsel up to speed in long-standing, hotly contested

---

[2] The Debtor is in the process of amending its Schedules and Statements of Financial Affairs to add these assets – although, notice of these assets has been provided to creditors and the Bankruptcy Court through pleadings filed in the case since the inception of these proceedings.

___

**DEBTOR'S RESPONSE TO MOTION FOR AN ORDER CONVERTING CASE TO CHAPTER 7**
Page 13 of 18

Coverage Litigation will not only be costly, but could create a huge set back to the Debtor in terms of its success and ultimate recovery.

34. Similarly, with regard to the Appeal, it is important the Debtor be allowed to maintain direction and control over existing counsel so as not to lose the advantage of existing counsel's and the Debtor's wealth and breadth of knowledge. It is tantamount that the estate not change horses in the midst of the appeal process, among other reasons, based on counsel's length of time working on the matter, identifying issues on appeal and time spent preparing opening briefing, and because of the value the Debtor brings to the process based on its actual first-hand involvement in the underlying litigation.

35. Additionally, creditors will be harmed by losing the institutional knowledge of the Debtor in the Coverage Litigation and the Appeal based on its background with the proceedings, its quick and easy access to evidence, ability to produce witnesses and sworn statements, the ability to efficiently formulate necessary discovery, and provide documentation to counsel - just with the other damage they have done to the value of the Debtor, perhaps this is what the Petitioning Creditors want? Success on the Appeal is most definitely not in their best interests! The Court should allow the Debtor to stay in control of the Coverage Litigation and Appeal until their conclusions and pay creditors based on these outcomes.

36. The Debtors will be subject to rigorous reporting requirements of the Chapter 11 process including filing MORs, Schedules and SOFAS[3] and furthermore cannot transact business or transfer assets outside of its ordinary course of business without appropriate Court orders under section 363 of the Bankruptcy Code, settle litigation without Court approval under Bankruptcy Rule 9019, and must adhere to all the other Code Sections and Rules, including

---

[3] Concurrently with the filing of the Response, Debtors are working on making amendments to their Schedules and SOFAs to ensure complete accurateness and the reflection of all assets and liabilities.

---

sections 364, 365, and others. Thus, the creditors are protected by the provisions of the Bankruptcy Code and the US Trustee Guidelines and other requirements applicable to a Chapter 11 Debtor-in-Possession. No conversion is necessary and in fact would do detrimental harm to the estates, thus unusual circumstances exist to deny the Motion.

## VI. ARGUMENTS AND AUTHORITIES

<u>Unusual Circumstances Exist</u>

37. Pursuant to 11 U.S.C. § 1112(b)(1), unusual circumstances exist which establish that the requested conversion is <u>not</u> in the best interest of creditors and the estate. Those unusual circumstances include but are not limited to the fact that the movants' are the appellees in a $9 million appeal, over which the Debtor's are currently directing the prosecution. If the movants are successful in their Motion, then the Debtor's who have the most knowledge about the underlying Lawsuit will no longer be in a position to direct counsel on the appeal. Petitioning Creditors surely would see this as a victory as they would continue to direct their own appellate counsel and provide input in defending the appeal, while Debtor's hands would be tied as a chapter 7 trustee would be in control and making determinations on an appeal of underlying Lawsuit that lasted almost 2 years, and with regard to which a chapter 7 trustee would have no familiarity. This would certainly give the Petitioning Creditors a leg up in the appeal process.

38. Additionally, due to the Debtor's long- standing history with regard to the facts and circumstances upon which the Coverage Litigation is based, it is in the best interests of creditors if Debtors remain in control of the Debtor's affairs and specifically continue to control this litigation. Value would be severely lost if a chapter 7 trustee who has no familiarity with the background, evidence, facts or history of this litigation were to replace the Debtor and its professionals after almost a year into the coverage suit.

<u>There is a Reasonable Likelihood the Debtor's Plan Will be Confirmed Within a Reasonable Period of Time</u>

39. Pursuant to 11 U.S.C. § 1112(b)(2)(A), in addition to the existence of unusual circumstances which prevent conversion, the Debtor can prove there is a reasonable likelihood that a plan will be confirmed within a reasonable period of time. The Debtor's Disclosure Statement and proposed Plan is being filed contemporaneously with this Response and thus more than an abundant amount of time exists for it to be solicited prior to the expiration of the exclusive periods under section 1121 of the Code. The exclusive period for filing a plan in this case is April 17, 2010 and the period by which the Debtor must solicit acceptances is June 17, 2010. Thus, the Debtor will not even utilize the full statutory time periods allowed under the Code to move forward on gaining acceptances to its plan.

40. With regard to section 1121(b)(2)(B), the facts set forth above, together with the evidence and testimony to be provided at the hearing on this matter, will establish a reasonable business justification for all the acts of the Debtor and its management that have been alleged to have any relevancy to the reasons referred to by Petitioning Creditors as somehow supporting the relief sought, or will be cured within a reasonable time.

<u>"Cause" Does Not Exist</u>

41. The Petitioning Creditors must establish "cause" before the Court can convert a case under chapter 11 to a case under chapter 7 under section 1112(b)(1). "Cause" includes:

> **(A)** substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> **(B)** gross mismanagement of the estate;
> **(C)** failure to maintain appropriate insurance that poses a risk to the estate or to the public;
> **(D)** unauthorized use of cash collateral substantially harmful to 1 or more creditors;
> **(E)** failure to comply with an order of the court;
> **(F)** unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;

**(G)** failure to attend the meeting of creditors convened under section 341 (a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;

**(H)** failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);

**(I)** failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

**(J)** failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

**(K)** failure to pay any fees or charges required under chapter 123 of title 28;

**(L)** revocation of an order of confirmation under section 1144;

**(M)** inability to effectuate substantial consummation of a confirmed plan;

**(N)** material default by the debtor with respect to a confirmed plan;

**(O)** termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

**(P)** failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(1).  <u>Not one of these factors can be established to exist in this Bankruptcy Case</u>.

42. Cause does not exist for the conversion of the Debtor's case to Chapter 11.  As shown from the facts set forth above, it was the acts of the Petitioning Creditors that caused the Debtor's business to diminish.

43. Among other reasons cause does not exist, the Debtor has complied will all orders of the Court, attended its 341 meeting, timely filed its Schedules and SOFA's, maintained appropriate insurance and remained current on its tax and other reporting obligations since the Order for Relief was entered.  By no means has the Debtor's management committed "gross mismanagement" of the Debtor's affairs or business, and instead, management has worked hard to stabilize and preserve value for its creditors, since the filing of the Involuntary Petition, and is continuing to do so despite efforts of the Petitioning Creditors to devalue and gut the enterprise.

**WHEREFORE, PREMISES CONSIDERED**, the Debtor respectfully request that the Court deny the relief requested in the Motion and grant Debtor such other and further relief to which it is entitled at law or in equity.

Dated: February 24, 2010.    Respectfully submitted,

    /s/ *Stephanie D. Curtis*
Stephanie D. Curtis
Texas State Bar No. 05286800
Mark A. Castillo
Texas State Bar No. 24047795
Zac Copp
Texas State Bar No. 24022750
**THE CURTIS LAW FIRM, PC**
901 Main Street, Suite 6515
Dallas, Texas 75202
Telephone: 214.752.2222
Facsimile: 214.752.0709

PROPOSED COUNSEL FOR DEBTOR
AND DEBTOR-IN-POSSESSION

## CERTIFICATE OF SERVICE

This is to certify that, on February 24, 2010, a true and correct copy of the foregoing document has been served on the below listed counsel for the Petitioning Creditors by ECF email notification upon filing.

Howard Marc Spector
Spector & Johnson, PLLC
Banner Place, Suite 1100
12770 Coit Road
Dallas, TX 75251
Fax: (214) 237-3380

ATTORNEY FOR PETITIONING
CREDITORS

    /s/ *Stephanie D. Curtis*
Stephanie D. Curtis