U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed November 08, 2010**

---

THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HENRY S. MILLER COMMERCIAL, LLC, | § | Case No. 09-34422-SGJ-11 |
| | § | |
| Debtor. | § | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER APPROVING IN PART AND DENYING IN PART THE FIRST AND FINAL FEE APPLICATION OF BANKRUPTCY COUNSEL TO DEBTOR-IN-POSSESSION

### A. INTRODUCTION.

Before this court is the First and Final Application for Final Allowance and Payment of Fees and Expenses as Counsel for the Chapter 11 Debtor ("Final Fee Application"), filed by The Curtis Law Firm, PC ("CLF" or "Applicant"). Such Final Fee Application requests allowance of **$177,548.20 in fees** and

**$4,730.67 of expenses**, plus $2,000 estimated fees for prosecution of the Final Fee Application, for a total request of **$184,278.87,** for the approximately six-month period Applicant served as bankruptcy counsel for the debtor-in-possession ("HSM Commercial" or "Debtor").[1]  To be clear, the Applicant served solely as **bankruptcy counsel** in the above-referenced case.  Also retained in this case were four other law firms for the Debtor:  (i) one to handle general corporate work (Geary, Porter & Donovan, P.C.); (ii) appellate counsel to pursue an appeal of a large prepetition judgment against the Debtor (Strasburger & Price, LLC); (iii) special litigation counsel to pursue a lawsuit against the Debtor's insurance carrier and Debtor's prior litigation counsel regarding alleged malfeasance in connection with the aforementioned large prepetition judgment (Shields, Britton and Fraser, P.C.); and (iv) special insurance coverage counsel (Shannon, Gracey, Ratliff & Miller, LLP).  *See* DE #84.  These four law firms were approved as "ordinary course professionals" for the Debtor and were relieved of the requirement of filing fee applications, so long as their fees stayed under a $10,000-per-month cap during the bankruptcy case.  Only one of these four other law firms exceeded the cap and has filed a fee application:

---

[1] The Applicant orally asked for an additional $3,000 in fees at the hearing on the Final Fee Application, to compensate it for extra time it spent (but did not earlier estimate) in connection with preparation for the hearing on the Final Fee Application, due to an objection filed by a party-in-interest.

Shields, Britton and Fraser, P.C., special litigation counsel, which is seeking allowance of fees and expenses in the amount of **$163,247.58** during the case (such application is separately pending before the court).[2]

One objection (the "Objection") was filed to CLF's Final Fee Application, arguing that the Final Fee Application should be significantly reduced, because the fees are excessive under the circumstances of this case, reflect duplication of efforts by professionals, and overstaffing of tasks (certain examples were cited in the Objection). The objectors did not appear at the hearing on the Final Fee Application. The objectors were the "Petitioning Creditors" (as later herein defined), who commenced the Debtor's bankruptcy case with an involuntary petition, and which, as a group, held the vast majority of claims in this case.[3] The court, of course, has a duty to evaluate the reasonableness of a fee request of a court-appointed

---

[2] Actually, another one of the Debtor's law firms, Strasburger & Price, is being paid by an insurance carrier for the Debtor, and so its fees may have exceeded the $10,000-per-month cap, but the firm was not required to undergo the fee application process since it is not seeking compensation from the estate.

[3] The court found it somewhat disturbing that the Applicant filed a reply to the Objection, ***accusing counsel for the objectors of colluding with litigation counsel for the Debtor*** in violation of Title 18 of the United States Code (18 U.S.C. § 155), by opposing Applicant's fees. CLF specifically characterized the Objection as "an unabashed attempt to have this court condone . . . a clandestine fee-fixing attempt" in violation of 18 U.S.C. § 155. These are strong words, indeed. The court finds that none of the evidence submitted supported this strong accusation of Title 18 violations. Thus, this court does not intend to make a criminal referral.

professional, regardless of whether an objection is lodged or prosecuted.  The court has determined, based on the record presented, that the fee request of CLF is indeed excessive, in light of the time and labor required, the novelty and difficulty (or lack thereof) of the issues, the skill required, and the overall level of complexity, importance, and nature of the problems, issues, and tasks that were addressed in this case.  11 U.S.C. § 330(a)(1).  The court has determined that the fee request should be **reduced by $73,723.94** and the expense reimbursement should be **reduced by $595**—for a total award reduction of **$74,318.94**.  Thus, the court is allowing final fees in this case of **$103,824.36** and final expenses of **$4,135.67,** plus $2,000 for prosecution of the Final Fee Application (for a total award of **$109,959.93** for the entire case).  All other amounts are denied.  The following shall constitute the court's findings of fact and conclusions of law in support of this ruling.[4]

**B.    FINDINGS OF FACT.**

1. The above-referenced case was commenced against HSM Commercial on July 7, 2009 ("Petition Date"), as an involuntary bankruptcy case.  The Debtor is not an operating company.  The Debtor is essentially a real estate brokerage firm that "operates" (or, perhaps more appropriately, *formerly* operated)

---

[4] The court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b).

through four wholly-owned subsidiaries.  The Debtor-entity was
formed on January 1, 2007 (it had previously done business, since
1994, through a predecessor known as Henry S. Miller Commercial
Co.).  The Debtor and its predecessor should not be confused with
the much larger entity known as Henry S. Miller Company
established in 1914.  The Debtor-entity was apparently formed for
commercial (as opposed to residential) real estate services.  The
Debtor had no employees as of the date of the Order for Relief,
but had a few dozen commissioned brokers or realtors, who
apparently had contractual agreements with the Debtor or its
affiliates.  *See* Exh. 10 (Disclosure Statement, p.8) and Exh. 3
(Schedules).

2.    The involuntary case against HSM Commercial was
commenced by a group of judgment creditors affiliated with a Mr.
Barry Nussbaum (the "Petitioning Creditors").  The Petitioning
Creditors, and various other entities related to them,
collectively obtained a prepetition judgment against HSM
Commercial, in the aggregate amount of $8,918,718.99, pertaining
to alleged fraud and negligent misrepresentation by HSM
Commercial in connection with a real estate transaction (the
"Nussbaum Entities Judgment").  The Nussbaum Entities Judgment is
currently on appeal.  Additionally, HSM Commercial is pursuing a
lawsuit against its former litigation counsel and insurance
carrier for alleged malfeasance in connection with the litigation

that resulted in the Nussbaum Entities Judgment.

3.    Through different bankruptcy counsel than the Applicant, HSM Commercial vigorously contested the involuntary petition for several months.[5]  Then, on December 17, 2009, HSM Commercial unexpectedly consented to an Order for Relief.

4.    The Debtor then filed Schedules on January 15, 2010.

5.    The Schedules listed, among the assets of the Debtor: (a) no real property; (b) approximately $77,000 of funds in a bank account at Regions Bank; (c) a few hundred thousand dollars of "trade receivables" owed *to* the Debtor by a small number of individuals (it appears these account debtors were mostly real estate brokers); and (d) an $847,000 receivable owed *to* the Debtor by an apparent insider of the Debtor called Henry S. Miller Central Services, LLC.[6]  With regard to liabilities:  (a) the Debtor scheduled one secured creditor owed $255,000 (in respect of a loan originally held by Regions Bank but later purchased by an insider of the Debtor; there was no collateral remaining associated with this loan); (b) the Internal Revenue

_____

[5] Such different bankruptcy counsel was Pronske & Patel law firm.  The court does not know what Pronske & Patel's fees incurred on behalf of HSM Commercial were, since the firm was engaged prior to any order for relief and there was no requirement that such firm file a fee application.

[6] The Schedules were later amended to list the equity interests of the Debtor in its four subsidiaries (no value attributed to these) and to disclose the litigation claims that the Debtor has asserted against its former lawyers and insurance carrier relating to the Nussbaum Entities Judgment.

Service as a priority creditor owed $32,000; (c) the Judgment Creditors; (d) some lawyers for unpaid legal fees; and (e) approximately seven or eight non-insider unsecured trade creditors (there are a few other unsecured claims that are either disputed broker claims or appear to clearly be insiders—the major one of which was Henry S. Miller Brokerage, LLC).

6. The Claims Register is further enlightening with regard to the relatively small universe of creditors in this case. It shows that **only three creditors (not including the Judgment Creditors) filed proofs of claim**: Pitney Bowes (Proof of Claim # 1 in the amount of $1,628.86); Mr. Daniel Shoevlin (Proofs of Claim ## 2 & 3, totaling approximately $14,000); and a landlord (Proof of Claim # 4, totaling approximately $50,000).[7]

7. On January 29, 2010—just a few weeks after the Order for Relief was entered—a motion to convert the case to Chapter 7 was filed by the Petitioning Creditors.

8. Then, on February 19, 2010 (a couple of weeks shy of the hearing on the motion to convert case to Chapter 7), an application to employ the Applicant, CLF, was filed (in other words, suddenly the Debtor had chosen to change bankruptcy

---

[7] An allegation was made early on during the case by the Petitioning Creditors that the reason that the Debtor and its subsidiaries had so little in the way of assets, liabilities, and operations as of the date of the Order for Relief was because, shortly after the entry of the Nussbaum Entities Judgment, the management of the Debtor created new entities and transferred most of the assets, liabilities, contracts, and operations that had previously been in the Debtor and its subsidiaries to the newly created entities. *See* DE # 89.

counsel from Pronske & Patel—counsel during the involuntary phase—to CLF). The court approved the CLF employment application.

9. As mentioned above, this Debtor was not an operating company as of the time of the Order for Relief. Thus, there were none of the "usual" operational issues that a Chapter 11 debtor often faces, to attempt to stabilize the business and normalize activities early on in the case. There was no liquidity crises to manage to maintain operations. There were no business stabilization issues (such as with vendors and customers). There were no employees of the Debtor—thus no employee payroll or severance motions. There were no cash collateral motions, debtor-in-possession financing requests, or other budgetary issues. There was no secured lender or lender-group to deal with at all (as earlier mentioned, although Regions Bank was originally scheduled with a $255,000 secured claim, the Applicant later amended the Debtor's Schedules to show that an insider of the Debtor purchased Region Bank's claim and there was no collateral left; in other words, no secured creditor *ever* visibly participated in this case). Thus, without the usual "800-pound gorilla" lender (with all due respect to lenders), there were no perfection-of-liens to evaluate or motions to lift stay or for adequate protection for the Debtor's counsel to tackle. There was also no unsecured creditors committee with which to skirmish.

Since the Debtor was not operating, there were no vendors; thus no reclamation issues and no Section 503(b)(9) issues. There was no Section 366 motion to deal with utilities. Since there was no tangible property, there were no taxing authorities asserting their interests. In fact, a review of the docket in the case shows that there were **only seven hearings** during the entire six-month period that the Applicant was engaged as bankruptcy counsel, and none of these were contested hearings (except, to some extent, the CLF employment application—as discussed more below).

10. The "requests for relief" filed by the Applicant during this case (not counting motions for expedited hearing) were as follows: (a) an application of the Debtor to employ counsel (*i.e.*, CLF, the Applicant) [DE #77]; (b) a motion asking the court to approve interim compensation procedures for the professionals for the Debtor [DE #78]; (c) an application for the Debtor to employ its four "ordinary course professionals" [DE # 84]; (d) a motion by the Debtor to quash a subpoena served by the Petitioning Creditors, relative to a motion to convert case that the Petitioning Creditors filed (but later withdrew or compromised) [DE #86]; (e) a motion to reject a real property lease and a lease on a postage meter [DE # 101]; (f) the Disclosure Statement and Plan [DE ## 103-104; 132-133; 135; 147; 154]; (g) Applicant's motions to draw down on retainer [DE ##107

& 139]; (h) a Debtor's motion for relief from stay, to the extent applicable, to go forward in the coverage litigation it was pursuing in state court against its insurer and former counsel [DE #124]; and (i) the Final Fee Application [DE # 164.]  In other words, five out of the nine "requests for relief" were related to employment and payment of professionals.

11.  As mentioned earlier, there were only *seven hearings* during the case at which Applicant appeared on behalf of the Debtor (on the following dates:  2/26/10; 3/23/10; 4/7/10; 4/13/10; 4/29/10; 5/6/10; 6/30/10).  Only the first hearing on 2/26/2010 was a contested hearing (CLF's employment application hearing), and only the last hearing (the confirmation hearing) was an evidentiary hearing.  None of the other hearings (not even the confirmation hearing) were contested.  The one contested hearing in the case (*i.e.,* the hearing pertaining to the Applicant's employment application) was contested for the sole reason that the Petitioning Creditors objected to an *insider* of the Debtor providing a $35,000 evergreen retainer to CLF (the Petitioning Creditors having the concern that the insider may have been the recipient of, or otherwise involved with, prepetition transfers of assets and operations of the Debtor).  The court sustained this objection (requiring the $35,000 retainer to be returned by CLF to the insider), but allowed CLF

to receive a $34,000 retainer from **Debtor** funds.[8]

    12.  When asked at the hearing on the Final Fee Application to address the results obtained in this case and/or the "identifiable, tangible and material benefits" to the estate from confirming a plan,[9] Applicant points to the fact that the Debtor's chapter 11 plan was overwhelmingly accepted by creditors, was a 100% payment-plan as to the creditors excluding the Judgment Creditors, and a compromise was struck with the Judgment Creditors.  However, all of these points ring somewhat hollow.  Only twelve ballots were cast for the confirmed plan: (a) six of which were cast by the Judgment Creditors, whose claims are still being disputed, (b) at least three ballots were cast by insiders, and (c) two ballots were cast by law firms representing the Debtor (who had prepetition claims).  In all candor, there were hardly any non-insider, non-law firm creditors

---

[8] The court specifically allowed CLF to obtain a $34,000 retainer from Debtor-funds that the Debtor had previously provided to the law firm of Pronske & Patel as a retainer, shortly before disengaging Pronske & Patel.  CLF filed a Second Supplemental Declaration on March 11, 2010, disclosing its subsequent receipt of this $34,000 from Pronske & Patel and CLF's return of the $35,000 retainer to the insider of the Debtor that had originally provided it.  Somewhere along the way, CLF obtained **another $35,000 retainer** during the case from the Debtor without specific permission from or disclosure to the court (at least not simultaneous disclosure).  CLF has taken the position there was full disclosure of this.  *See* DE # 178 (a post-hearing submission by CLF).  While the court is extremely concerned about what seems like less-than-fulsome disclosure of the second $35,000 retainer, the court will take no follow up action on this, but will rather give CLF the benefit of the doubt.

[9] *See Andrews & Kurth L.L.P. v. Family Snacks (In re Pro-Snax Distribs., Inc.),* 157 F.3d 414, 426 (5th Cir. 1998).

here, other than the disputed Judgement Creditors.  And the "compromise" with the Judgment Creditors hardly seems worthy of that label.  There was no "settlement" of the litigation with the Judgment Creditors at all really.  For virtually the entire case, this court received oral reports that the Debtor had struck a compromise with its Judgment Creditors and that settlement documents were being drafted.  At the end of the day, the "settlement" was merely that the Judgment Creditors (through their lawyers' IOLTA account) would receive certain nonrefundable cash payments during the initial few months of the plan, *during the pendency of the Debtor's continued appeal of the Nussbaum Entities Judgment* (these payments will be funded from a $400,000 equity infusion from the reorganized Debtor's existing equity; the $400,000 cash infusion will also cover administrative expenses, not otherwise covered by attorney retainers, and other claims), and, if the Nussbaum Entities' Judgment is ultimately affirmed and thus "allowed," there will be a formulaic division of proceeds between the Debtor and the Judgment Creditors from the proceeds that the Debtor hopes to receive in its malpractice/malfeasance lawsuit it is pursuing against its insurance carrier and its former lawyers.

13.  The court is struggling mightily to understand what was meaningfully accomplished by this Chapter 11 case.  No going concern value of an operating company was preserved.  No debts

were restructured or claims compromised.  No jobs were saved.  No value was preserved or created, as best this court can determine from the evidence presented.  No burdensome litigation was ended.  No assets were liquidated or maximized for creditors.  No notable problems were solved.  Yet, a lot of lawyers incurred fees.[10] And, presumably, some affiliates and insiders of the Debtor have been spared from lawsuits by the Judgment Creditors, for so long as the Debtor pursues its claims against its insurer and former counsel pursuant to the Debtor's Plan.  *See* Exh. 15 (Debtor's Plan, Section 16.21, injunction language).

14.  While this court does not believe counsel for a chapter 11 debtor underwrites any particular result or is a guarantor in any form or fashion of success, here, we have really very little to show to justify the Chapter 11 process.  If a Debtor wants to proceed in Chapter 11, and no party-in-interest is opposing this effort (by pressing for dismissal or conversion and a trustee),

---

[10] The court is compelled to point out what surely must be boilerplate language in the Final Fee Application:  "this case would be considered undesirable from the following standpoints:  a) the magnitude of the legal burdens of the case in the face of the delay and uncertainty in obtaining full compensation in comparison with other cases; and b) substantial and urgent time and work involved in preparing to litigate material and dispositive conversion and related issues."  Final Fee Application, p. 11.  This is simply not even remotely accurate for this particular case.  There was no "magnitude of the legal burdens," and no "urgent time and work involved."  This was not the "melting ice cube" case that courts so often see in Chapter 11.  It was mostly a two-party dispute.  Any "legal burdens" were mostly being managed by appellate counsel and special litigation counsel.  No litigation was resolved in the case (except for convincing the Petitioning Creditors to back off of their conversion motion).

the court will generally give great latitude to permit that choice of remedy. ***However, at the end of the day, this court must independently assess the fees associated with that effort.*** Here, the end did not justify the means (or at least the fees). While this court has said many times in approving fee applications, that "you get what you pay for," and this court has no problem awarding substantial fees to a professional who works hard to significantly assist a client in the preservation or generation of value, or who crafts a creative solution to complex problems, the court does have a problem with awarding generous fees where no significant activity occurred, no value was generated, nothing was complex, no problems were meaningfully solved and, in fact, the case was mostly about preparing routine documents, protecting insiders, and billing.[11]

---

[11] The Applicant has argued that the advantage to the Chapter 11 plan versus a Chapter 7 case was that a Chapter 7 Trustee may not have had the cooperation of officers and directors of the Debtor in the future litigation contemplated by the plan and, thus, such litigation value would not have been maximized to the extent it will be under the Debtor's plan. The Final Fee Application also states that "the Debtor has successfully confirmed a plan of reorganization to provide a dividend to creditors that otherwise likely would receive little to no payments in a chapter 7 liquidation." Final Fee Application, p. 11. This court struggles with how this plan has really provided greater or more certainty of a dividend to the handful of creditors than if a Chapter 7 Trustee had charged ahead with the litigation that the post-reorganized Debtor intends to prosecute. An insurance company/policy is paying the attorneys pursuing the appeal. And while it is true that insiders are funding $400,000 for fees of Debtor's counsel and special litigation counsel and providing for some initial payments to the Judgment Creditors (which funding a Chapter 7 Trustee would not have necessarily had), the Debtor had significant receivables against insiders that a Chapter 7 Trustee might have pursued to get to the same or even a better place (as the $400,000 of funding).

15.  To reiterate, CLF was not handling the appeal of the Nussbaum Entities Judgment.  CLF was not handling insurance coverage issues or the litigation against the Debtor's insurer or former counsel.  Basically, CLF served as the bankruptcy "dock jocks" papering an uncomplicated Chapter 11 plan—where there were hardly any creditors, and nothing was fully compromised.  There was no complexity at all.  No novel issues.  No challenging issues.[12]

## C.  CONCLUSIONS OF LAW.

1.  Pursuant to Sections 327 and 1107 of the Bankruptcy Code, a debtor-in-possession, with the court's approval, may employ one or more disinterested professionals who are free from adverse interests to assist with the administration of the estate.

2.  Section 330(a)(1) of the Bankruptcy Code provides that after notice and a hearing, the court may award to, among others, a professional person employed under section 327, "reasonable compensation for actual, necessary services rendered" by the professional person and "reimbursement for actual, necessary expenses."  The statute elaborates that in determining what is

---

[12] The Final Fee Application states at page 9 that many of the tasks reflected "involved factual and legal questions which were of high difficulty and often required prompt action."  The court suspects this was boiler plate language lifted from other fee applications and surely was not thoughtfully crafted for this particular case. Nothing in this case could fairly be described as involving "high difficulty" or requiring "prompt action."

"reasonable," the court "shall consider **the nature**, **the extent** and **the value** of such services," and this further means assessing "all relevant factors," including: (a) "time spent"; (b) "rates charged"; (c) whether the services were "necessary to the [case] administration" **or** "beneficial at the time at which the services was rendered toward the completion" of the case; (d) whether a "reasonable amount of time" was spent on particular services when considering the "complexity, importance, and nature of the problem, issue, or task addressed." Bankruptcy courts should also consider the "customary compensation charged" by "comparably skilled practitioners" in other cases in assessing reasonableness. Finally, the statute instructs that "unnecessary duplication of services" shall not be allowed, nor shall services that were not "reasonably likely to benefit the debtor's estate" **or** "necessary to the administration of the estate."

3.    The Fifth Circuit has also opined that an objective standard of reasonableness is not appropriate—in other words, it is not appropriate to look at "whether the services were objectively beneficial toward completion of the case at the time they were performed." *Pro-Snax*, 157 F.3d at 426. Rather, a more stringent test applies of whether the services resulted in an "identifiable, tangible, and material benefit to the bankruptcy estate"—if so, the services are compensable. *Id.* At the time the services are performed, the chances of success must outweigh

the costs of pursuing the action.  *Id.*  Additionally, the Fifth

Circuit has also articulated twelve factors the court should

consider in evaluating fee requests in the case of *Am. Benefit*

*Life Ins. Co. v. Baddock (In re First Colonial Corp. of America)*,

544 F.2d 1291 (5th Cir. 1977), *cert. denied*, 431 U.S. 904

(1977).[13]

4.    Tasks that are mandatory should be presumed to benefit

the estate (and judged only for reasonableness).  *In re Weaver*,

336 B.R. 115, 122 (Bankr. W.D. Tex. 2005).  Tasks that are not

mandatory but nevertheless benefit the estate should be

compensable (again, fees are judged for reasonableness).  *Id.*

**(i.) <u>Specific Fees Sought and Disallowed</u>**.

5.    The Final Fee Application (spanning roughly six months)

reflects **<u>559.5 hours</u>** of time billed by CLF at an average hourly

rate of **<u>$317.81 per hour.</u>**  Eight different lawyers billed to this

case (four "Senior Attorneys" and four "Junior Associates").  Two

law clerks billed $858 (7.8 hours) and $1,550 (14 hours).  The

fees and time are sub-divided into the ten categories set forth

---

[13] The twelve factors in awarding attorneys fees are: (1) the time
and labor required; (2) the novelty and difficulty of the
questions; (3) the skill requisite to perform the legal services
properly; (4) the preclusion of other employment by the attorney
due to acceptance of the case; (5) the customary fee; (6) whether
the fee is fixed or contingent; (7) time limitations imposed by
the client or other circumstances; (8) the amount involved and
the results obtained; (9) the experience, reputation, and the
ability of the attorneys; (10) the "undesirability" of the case;
(11) the nature and length of the professional relationship with
the client; (12) awards in similar cases.  *Id.* at 1298-99.

below. As can be seen, the vast majority of time is in the categories of "Litigation Matters," "Disclosure Statement and Plan," and "Retention and Fee Application."

**a. Case Administration: 31.4 hours/$9,656.50 of fees.** This category is identified as including meetings with the client, maintaining dockets, calendars, and service lists, reviewing miscellaneous pleadings and correspondence, case management support, organization of case related documents and correspondence and the like. The court will approve all of this time as reasonable.

**b. Claims Analysis/Litigation: .8 hours/$349 of fees.** Time "reviewing brokerage documents and proofs of claim filed." The court will approve all of this time as reasonable.

**c. Schedules/SOFA/Top 20: 42.2 hours/$11,529 of fees.** Time "finalizing and reviewing Debtor's schedules, statement of financial affairs," *etc.* "to piece together the Debtor's assets and liabilities." Note that prior counsel prepared the Schedules and SOFAs, although CLF did amend these. The court will approve all of this time as reasonable.

**d. Creditor Inquiries/Meetings: 7.2 hours/$1,802.50 of fees.** This category is described by CLF as including "review and analysis of the Debtor's 341 meeting of creditors" (prior counsel was in place at this meeting) and correspondence with the Debtor and creditors regarding case matters. The court will approve all of this time as reasonable.

**e. Financing/Cash Collateral: 11.1 hours/$3,665.50 of fees.** There was no cash collateral or financing in this case. This category seems more accurately to reflect time spent in connection with the Debtor's monthly operating reports and attention to cash flow issues (limited as these items were—considering the Debtor was not an operating company). The court will approve all of this time as reasonable.

**f. Leases, Executory Contracts, and Utilities: 18.7 hours/$5,842 of fees.** Time billed in this category would be at the rate of $312.41 per hour ($5,842 divided by 18.7 hours). There were just two leases in this case, both of which were rejected. One was a real property lease the Debtor had chosen no longer to use and one was for a lease of a postage meter the Debtor no longer needed. The hearing on these matters was not contested or evidentiary; there appeared to be no meaningful

opposition by either lessor and there was no litigation over their lease rejection claims. The court cannot conclude all of this time was "reasonable," considering **the nature**, **the extent** and **the value** of such services. The court cannot conclude that a reasonable amount of time was spent on these particular services when considering the "complexity, importance, and nature of the problem, issue, or task addressed." <u>**The court concludes that, at most, 10 hours should have been spent on the activity of rejecting these two leases. Thus, the court will reduce the Final Fee Application by 8.7 hours which, multiplied by $312.41 per hour, equals a $2,717.94 fee reduction.**</u>

      **g.  Corporate/Business Operations: 4.7 hours/$1,906 of fees.** The Final Fee Application reflects that this category includes time corresponding with the Debtor regarding "general operational issues"—not clear what those would be since the company was not an operating company. Nevertheless, the court will approve all of this time as reasonable.

      **h.  Litigation Matters: 186.5 hours/$61,479.50 of fees.** Time billed in this category would be at the rate of $329.65 per hour ($61,479.50 divided by 186.5 hours). The Final Fee Application describes this category as including "substantial work toward litigating and ultimately resolving dispositive matters related to potential conversion of the Debtor's case and/or confirmation of the Debtor's Plan," further including communications with client and creditors and preparing for trial. There was never a hearing on conversion and no contested confirmation hearing. Moreover, a conversion hearing in the context of this Debtor (and discovery leading up thereto) would not seem to be overly complex. The court stresses that CLF was not working on the appellate litigation nor the litigation against former counsel and the insurance carrier. Moreover, the "settlement" with the Petitioning Creditors was not a meaningful settlement—just some guaranteed cash payments to them (or their lawyers, really) during the pendency of the appeal of the Nussbaum Entities Judgment and, if their judgment is ultimately affirmed, a formulaic splitting of proceeds the Debtor ultimately might realize in its litigation against former counsel and Debtor's insurance carrier. In all events, there was no meaningful litigation in the bankruptcy court. The court notes that a fair amount of time was mis-billed to this category (*e.g.,* time attributable to retention matters or other case matters). All in all, the court cannot conclude that all of this time was "reasonable," considering **the nature**, **the extent** and **the value** of such services. The court cannot conclude that a reasonable amount of time was spent on these particular services when considering the "complexity, importance, and nature of the

problem, issue, or task addressed." The court finds and
concludes that about twice as much time and fees were billed to
this estate than was justified under the circumstances. **Thus,
the court will reduce the fees by half in this category—applying
a $30,739.75 fee reduction**.

   **i. Avoidance Actions: .4 hours/$180 of fees**. This
includes attention to preference claims (none pursued). The court
will approve all of this time as reasonable.

   **j. Plan and Disclosure Statement: 175.5
hours/$64,241.50 of fees**. Time billed in this category would be
at the rate of $366.05 per hour ($64,241.50 divided by 175.5
hours). This includes all tasks related to plan and disclosure
statement formulation, drafting, solicitation, prosecution, and
implementation. The court believes the time spent in this
category was extraordinary for such an uncomplicated plan,
involving so few creditors, so few assets, so little global
resolution of problems/litigation, and so little contentiousness.
The plan and disclosure statement are largely boiler plate. The
disclosure statement is 23 pages and the plan is 26 pages. The
only exhibit thereto was a half-page simple liquidation analysis.
There were only a handful of creditors to classify. There was
very little background to describe. There were few creditors to
solicit. As mentioned earlier, there was no restructuring
accomplished or meaningful compromises in this court's
estimation. The court cannot conclude that all of this time in
this category was "reasonable," considering **the nature**, **the
extent** and **the value** of such services. The court cannot conclude
that a reasonable amount of time was spent on these particular
services when considering the "complexity, importance, and nature
of the problem, issue, or task addressed." **The court concludes
that the fees should be reduced by half in this category—applying
a $32,120.75 fee reduction.**

   **k. Retention and Fee Application: 80.8
hours/$25,921.50 of fees**. Time billed in this category would be
at the rate of $320.81 per hour ($25,921.50 divided by 80.8
hours). This includes time spent on preparing and prosecuting
Applicant's own retention papers and fee application, as well as
an application to employ ordinary course of business counsel.
Only the Applicant's employment application and Fee Application
were contested. The retention papers were form-like in nature.
There were hardly any creditors in this case and, thus, hardly
any "connections" to disclose, describe, and analyze. There were
only four ordinary course professionals to describe in the
application for approval of ordinary course professionals.
Motions to draw down on retainers and fee applications are

projects that can largely be completed by paralegals and should not become a fee-generating cash cow in and of themselves. The court cannot conclude that all of this time in this category was "reasonable," considering **the nature**, **the extent** and **the value** of such services. Specifically, here the court finds and concludes that fees in this category were extraordinary and unreasonable because the average rate ($320.81) was not commensurate with the complexity of the tasks. Most of this time in this category should have been incurred by paralegals or junior associates. **The court will reduce the fees in this category by $8,145.50, concluding that the time in this category should have been billed at no more than $220 per hour ($220 times 80.8 hours equals $17,776)—which would be reasonable fees for the tasks described (and in the context of the complexity of this case).**

    **(ii.) <u>Specific Expenses Sought and Disallowed</u>.**

    6. The Final Fee Application seeks reimbursement for $4,730.67 of expenses during the application period. The court will allow all of these as reasonable except for the following: the Applicant has sought reimbursement for after hours HVAC on April 8, 26, and 28, 2010 ($385); June 23, 2010 ($105); June 29, 2010 ($105). This is overhead expense—pure and simple—and was improperly charged to a bankruptcy estate. No exceptional circumstances have been presented to justify seeking such an expense. **Thus an expense reduction of $595 will be imposed.**

**D. CONCLUSION.**

    The "take-away" from this ruling should be this: Reasonable billing judgment needs to be exercised by professionals. Fees and expenses, at a minimum, need to be commensurate with the difficulty of the tasks and with the case complexity. The complexity of this case and the results obtained did not warrant the magnitude of fees incurred. In summary, the court has

determined that the fee request should be reduced by **$73,723.94**

and the expense reimbursement should be reduced by **$595**—for a

total reward reduction of **$74,318.94.**  Thus, the court is

allowing final fees in this case of **$103,824.26** and final

expenses of **$4,135.67,** plus $2,0000 for prosecution of the Final

Fee Application (for a total award of **$109,959.93** for the entire

case).  All other amounts are denied.  Counsel is directed to

return any unused retainer it holds in excess of the unpaid

amounts.

It is so **ORDERED.**

**###END OF ORDER###**
