


U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed November 09, 2010**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| HENRY S. MILLER COMMERCIAL, LLC, | § | Case No. 09-34422-SGJ-11 |
| | § | |
| Debtor. | § | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER APPROVING IN PART
AND DENYING IN PART THE AMENDED FIRST AND FINAL FEE APPLICATION
OF SPECIAL LITIGATION COUNSEL TO DEBTOR-IN-POSSESSION**

**A.  INTRODUCTION.**

Before this court is the Amended First and Final Application for Final Allowance of Compensation for Services Rendered and Reimbursement of Expenses ("Final Fee Application"), filed by James D. Shields and Shields, Britton & Fraser, P.C. (hereinafter "Shields" or the "Applicant") as special litigation counsel for the Debtor ("Debtor" or "HSM Commercial").  Such Final Fee Application requests allowance of **$149,913.00 of fees** and **$13,334.58 of expenses** for a total of **$163,247.58.**

ORDER REGARDING FINAL FEE APPLICATION                                    PAGE 1

Shields' fees and expenses requested span the time period from December 17, 2009 through August 27, 2010.[1]  Shields is one of five law firms engaged by the Debtor in this Chapter 11 case. Shields was approved as special litigation counsel to pursue a lawsuit (the "Malpractice/Malfeasance Litigation").  The Malpractice/Malfeasance Litigation was initiated prepetition by HSM Commercial against the Debtor's insurance carrier and the Debtor's prior litigation counsel, regarding alleged malfeasance in connection with a large prepetition judgment rendered against HSM Commercial.  The Malpractice/Malfeasance Litigation was not very far along at the end of the Debtor's case (*i.e.,* at confirmation or at the time of the hearing on the Final Fee Application).  Other law firms employed by the Debtor during the bankruptcy case include The Curtis Law Firm, PC ("CLF"), which served as bankruptcy counsel and requested **$177,548.20 in fees** and **$4,730.67 of expenses**, for a total request of **$184,278.83** for the approximately six-month period Applicant served as bankruptcy counsel for the Debtor.[2]  Also retained in this case were:  (i) a

---

[1] Shields actually submitted time records starting before December 17, 2009, but December 17, 2009 was the date of entry of the Order for Relief and the date that Shields' employment began for purposes of the Final Fee Application.

[2] The court has determined in a separate ruling [DE # 186] that the fee request of CLF should be **reduced by $73,723.94** and the expense reimbursement should be **reduced by $595**—for a total award reduction of **$74,318.94**.  Thus, the court has allowed to CLF final fees in this case of **$103,824.36** and final expenses of **$4,135.67,** plus $2,000 for prosecution of the CLF fee application (for a total award of

law firm to handle general corporate work (Geary, Porter & Donovan, P.C.); (ii) appellate counsel to handle an appeal of a large prepetition judgment against the Debtor (Strasburger & Price, LLC); and (iii) special insurance coverage counsel (Shannon, Gracey, Ratliff & Miller, LLP). *See* DE # 84. These three law firms—as well as Shields—were each approved as so-called "ordinary course professionals" for the Debtor and were relieved of satisfying the standards of Section 327 (*i.e.*, relieved from showing that they had no connections that might create a lack of "disinterestedness" or an "adverse interest") and from filing fee applications, so long as their fees stayed under a $10,000-per-month cap during the bankruptcy case. Shields is the only "ordinary course professional" that exceeded the cap and has filed a fee application.[3]

The motion for approval of ordinary course professionals that requested court authority to employ Shields and the other "ordinary course professionals" was filed on February 23, 2010 (the "Ordinary Course Motion"). *See* DE # 84. At paragraph 8, the Ordinary Course Motion provides that the Debtor wished "to employ the Ordinary Course Professionals only as necessary to

---

**$109,959.93** for the entire case).

[3] Actually, another one of the Debtor's law firms, Strasburger & Price, is being paid by an insurance carrier for the Debtor, and so its fees may have exceeded the $10,000-per-month cap, but the firm was not required to undergo the fee application process since it is not seeking compensation from the estate.

preserve the value of the Debtor's assets" and that "(a) expenses of the Ordinary Course Professionals will be kept to a minimum, and (b) the Ordinary Course Professionals **will not perform substantial services relating to bankruptcy matters, except with leave of the Court**" (emphasis added).  At paragraph 15, the Ordinary Course Motion further provides that "The Ordinary Course Professionals will **not be involved in the administration of the bankruptcy case** but, rather, will provide services in connection with the Debtor's ongoing collection and liquidation operations. . . . **The Debtor shall seek specific Court authority under Section 327 of the Bankruptcy Code to employ any other professionals involved in the actual administration of the Bankruptcy Case**" (emphasis added).  Finally, on Exhibit A, which is attached to the Ordinary Course Motion, Shields' specific engagement was limited to "Prosecution of claims against the Debtor's insurance company and former litigation counsel."  An order approving the Ordinary Course Motion was entered on March 24, 2010, effective back to December 17, 2009 [DE # 109].

There were no objections to the Shields Final Fee Application.  However, the court, of course, has a duty to evaluate the reasonableness of a fee request of a court-appointed professional, regardless of whether an objection is lodged or prosecuted.  The court has determined, based on the record presented, that the Final Fee Application of Shields is excessive

and duplicative, in that the Shields firm went **well beyond** the scope of their requested specific employment and charged fees pertaining to bankruptcy case administration (all while CLF was incurring significant fees on the same type of bankruptcy case administration tasks). Again, the Ordinary Course Motion vowed that "***The Ordinary Course Professionals will not be involved in the administration of the bankruptcy case***" and that the Debtor would "***seek specific Court authority under Section 327 of the Bankruptcy Code to employ any other professionals involved in the actual administration of the Bankruptcy Case***." The court has determined that Shields' fee request should be reduced by **$58,764.** Thus, the court is allowing final fees in this case of **$91,149** and final expenses of **$13,334.58** for a total award of **$104,483.58** for the entire case. All other amounts are denied.

The following shall constitute the court's findings of fact and conclusions of law in support of this ruling.[4]

**B. FINDINGS OF FACT.[5]**

1. The above-referenced case was commenced against HSM

---

[4] The court has jurisdiction of this matter pursuant to 28 U.S.C. § 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b).

[5] More detailed Findings of Fact, describing the background of this bankruptcy case, are found at DE # 186, which are Findings of Fact, Conclusions of Law and an Order pertaining to the final fee application of primary bankruptcy counsel in this case, CLF. The court hereby incorporates all of those Findings of Fact and Conclusions of Law by reference herein.

Commercial on July 7, 2009 ("Petition Date"), as an involuntary bankruptcy case. The Debtor is not an operating company. The Debtor was essentially a real estate brokerage firm that *formerly* operated through four wholly-owned subsidiaries. The Debtor-entity was formed on January 1, 2007 (it had previously done business, since 1994, through a predecessor known as Henry S. Miller Commercial Co.). The Debtor and its predecessor should not be confused with the much larger entity known as Henry S. Miller Company established in 1914. The Debtor-entity was apparently formed for commercial (as opposed to residential) real estate services. The Debtor had no employees as of the date of the Order for Relief, but had a few dozen commissioned brokers or realtors, who apparently had contractual agreements with the Debtor or its affiliates. *See* Disclosure Statement and Schedules (on file in this case).

2. The involuntary case against HSM Commercial was commenced by a group of judgment creditors affiliated with a Mr. Barry Nussbaum (the "Petitioning Creditors"). The Petitioning Creditors, and various other entities related to them, collectively obtained a prepetition judgment against HSM Commercial, in the aggregate amount of $8,918,718.99, pertaining to alleged fraud and negligent misrepresentation by HSM Commercial in connection with a real estate transaction (the "Nussbaum Entities Judgment"). The Nussbaum Entities Judgment is

currently on appeal. Additionally, HSM Commercial is pursuing a lawsuit against its former litigation counsel and insurance carrier for alleged malfeasance in connection with the litigation that resulted in the Nussbaum Entities Judgment (earlier defined herein as the Malpractice/Malfeasance Litigation—*i.e.*, the special matter Shields was engaged to work on).

3.  Initially, HSM Commercial vigorously contested the involuntary petition for several months.[6]  Then, on December 17, 2009, HSM Commercial unexpectedly consented to an Order for Relief.

4.  The Debtor then filed Schedules on January 15, 2010.

5.  The Schedules listed, among the assets of the Debtor: (a) no real property; (b) approximately $77,000 of funds in a bank account at Regions Bank; (c) a few hundred thousand dollars of "trade receivables" owed **to** the Debtor by a small number of individuals (it appears these account debtors were mostly real estate brokers); and (d) an $847,000 receivable owed **to** the Debtor by an apparent insider of the Debtor called Henry S. Miller Central Services, LLC.[7]  With regard to liabilities:  (a)

---

[6] HSM Commercial contested the involuntary petition through yet a different law firm:  Pronske & Patel.  Pronske & Patel was disengaged by the Debtor shortly after the order for relief.  The court does not know what Pronske & Patel's fees incurred on behalf of HSM Commercial were, since the firm was engaged prior to any order for relief and there was no requirement that such firm file a fee application.

[7] The Schedules were later amended to list the equity interests of the Debtor in its four subsidiaries (no value attributed to these) and to

the Debtor scheduled one secured creditor owed $255,000 (in respect of a loan originally held by Regions Bank but later purchased by an insider of the Debtor; there was no collateral remaining associated with this loan); (b) the Internal Revenue Service as a priority creditor owed $32,000; (c) the Judgment Creditors; (d) some lawyers for unpaid legal fees; and (e) approximately seven or eight non-insider unsecured trade creditors (there are a few other unsecured claims that are either disputed broker claims or appear to clearly be insiders—the major one of which was Henry S. Miller Brokerage, LLC).

6. The Claims Register in this case shows that only three creditors (not including the Judgment Creditors) filed proofs of claim: Pitney Bowes (Proof of Claim # 1 in the amount of $1,628.86); Mr. Daniel Shoevlin (Proofs of Claim ## 2 & 3, totaling approximately $14,000); and a landlord (Proof of Claim # 4, totaling approximately $50,000).[8]

7. As mentioned, this Debtor was not an operating company as of the time of the Order for Relief. Thus, there were none of

---

disclose the litigation claims that the Debtor has asserted against its former lawyers and insurance carrier relating to the Nussbaum Entities Judgment.

[8] An allegation was made early on during the case by the Petitioning Creditors that the reason that the Debtor and its subsidiaries had so little in the way of assets, liabilities, and operations as of the date of the Order for Relief was because, shortly after the entry of the Nussbaum Entities Judgment, the management of the Debtor created new entities and transferred most of the assets, liabilities, contracts, and operations that had previously been in the Debtor and its subsidiaries to the newly created entities. *See* DE # 89.

the "usual" operational issues that a Chapter 11 debtor often faces, to attempt to stabilize the business and normalize activities early on in the case. There was no liquidity crises to manage to maintain operations. There were no business stabilization issues (such as with vendors and customers). There were no employees of the Debtor—thus no employee payroll or severance motions. There were no cash collateral motions, debtor-in-possession financing requests, or other budgetary issues. There was no secured lender or lender-group to deal with at all (as earlier mentioned, although Regions Bank was originally scheduled with a $255,000 secured claim, the Applicant later amended the Debtor's Schedules to show that an insider of the Debtor purchased Region Bank's claim and there was no collateral left; in other words, no secured creditor *ever* visibly participated in this case). Thus, there were no perfection-of-liens to evaluate or motions to lift stay or for adequate protection for the Debtor's counsel to tackle. There was also no unsecured creditors committee with which to skirmish. Since the Debtor was not operating, there were no vendors; thus no reclamation issues and no Section 503(b)(9) issues. There was no Section 366 motion to deal with utilities. Since there was no tangible property, there were no taxing authorities asserting their interests. In fact, a review of the docket in the case shows that there were *only seven hearings* during the roughly six-

month period between the Order for Relief and confirmation.

8.    The "requests for relief" filed by the Debtor during this case (not counting motions for expedited hearing) were as follows: (a) an application of the Debtor to employ bankruptcy counsel [DE #77]; (b) a motion asking the court to approve interim compensation procedures for the professionals for the Debtor [DE #78]; (c) an application for the Debtor to employ its four "ordinary course professionals" [DE # 84]; (d) a motion by the Debtor to quash a subpoena served by the Petitioning Creditors, relative to a motion to convert case that the Petitioning Creditors filed (but later withdrew or compromised) [DE #86]; (e) a motion to reject a real property lease and a lease on a postage meter [DE # 101]; (f) the Disclosure Statement and Plan [DE ## 103-104; 132-133; 135; 147; 154]; (g) motions to draw down on retainer by primary bankruptcy counsel [DE ##107 & 139]; (h) a Debtor's motion for relief from stay, to the extent applicable, to go forward in the Malpractice/Malfeasance Litigation [DE #124]; and (i) the Final Fee Applications of Shields and primary bankruptcy counsel [DE ## 164 & 167].  In other words, five out of the nine "requests for relief" were related to employment and payment of professionals.

9.    The Debtor and its lawyers describe the results obtained in this bankruptcy as successful because of the following: the Debtor's chapter 11 plan was overwhelmingly accepted by

creditors, was a 100% payment-plan as to the creditors excluding the Judgment Creditors, and a compromise was struck with the Judgment Creditors. These points ring somewhat hollow. Only twelve ballots were cast for the confirmed plan: (a) six of which were cast by the Judgment Creditors, whose claims are still being disputed, (b) at least three ballots were cast by insiders, and (c) two ballots were cast by law firms representing the Debtor (who had prepetition claims). In all candor, there was hardly any non-insider, non-law firm creditors here, other than the disputed Judgement Creditors. And the "compromise" with the Judgment Creditors hardly seems worthy of that label. There was no "settlement" of the litigation with the Judgment Creditors at all really. For virtually the entire case, this court received oral reports that the Debtor had struck a compromise with its Judgment Creditors and that settlement documents were being drafted. At the end of the day, the "settlement" was merely that the Judgment Creditors (through their lawyers' IOLTA account) would receive certain nonrefundable cash payments during the initial few months of the plan, *during the pendency of the Debtor's continued appeal of the Nussbaum Entities Judgment* (these payments will be funded from a $400,000 equity infusion from the reorganized Debtor's existing equity; the $400,000 cash infusion will also cover administrative expenses, not otherwise covered by attorney retainers, and other claims), and, if the

Nussbaum Entities' Judgment is ultimately affirmed and thus "allowed," there will be a formulaic division of proceeds between the Debtor and the Judgment Creditors from the proceeds that the Debtor hopes to receive in the Malpractice/Malfeasance Litigation.

C.    **CONCLUSIONS OF LAW.**

1.    Pursuant to Sections 327 and 1107 of the Bankruptcy Code, a debtor-in-possession, with the court's approval, may employ one or more disinterested professionals who are free from adverse interests to assist with the administration of the estate.

2.    Section 330(a)(1) of the Bankruptcy Code provides that after notice and a hearing, the court may award to, among others, a professional person employed under section 327, "reasonable compensation for actual, necessary services rendered" by the professional person and "reimbursement for actual, necessary expenses."  The statute elaborates that in determining what is "reasonable," the court "shall consider *the nature*, *the extent* and *the value* of such services," and this further means assessing "all relevant factors," including: (a) "time spent"; (b) "rates charged"; (c) whether the services were "necessary to the [case] administration" *or* "beneficial at the time at which the services was rendered toward the completion" of the case; and (d) whether a "reasonable amount of time" was spent on particular services

when considering the "complexity, importance, and nature of the problem, issue, or task addressed."  Bankruptcy courts should also consider the "customary compensation charged" by "comparably skilled practitioners" in other cases in assessing reasonableness.  Finally, the statute instructs that "unnecessary duplication of services" shall not be allowed, nor shall services that were not "reasonably likely to benefit the debtor's estate" *or* "necessary to the administration of the estate."

3.   Here, in the case of the Shields Final Fee Application, the analysis is not so much applying the Section 330 factors to the tasks undertaken, but rather the issue is that **a great number of tasks undertaken were simply not authorized** by the Order approving Shields' employment as an "ordinary course professional."  A representation was made that Shields would be special litigation counsel to handle **one discreet aspect** of this Debtor's case:  the Malpractice/Malfeasance Litigation.  A further representation was made that a further court order would be sought for any law firm that would be involved in bankruptcy case administration.  Moreover, primary Debtor's counsel (CLF) was engaged to handle case administration and charged a significant amount of fees in that endeavor.  According to Shields' submissions to the court [DE ## 184-185, which are unredacted time records submitted in camera, that supplemented the actual Final Fee Application which attached redacted time

records], Shields incurred fees in the categories below.

>        **a.  Case Administration:  43 hours/$18,190 of fees.**
None of this time appears to relate to the
Malpractice/Malfeasance Litigation.  The court will approve none
of this time as reasonable, as it was not within the scope of
Shields' requested engagement and appears duplicative of primary
bankruptcy counsel's services.

>        **b.  Claims Analysis/Litigation:  4.25 hours/$1,655 of
fees.** The court will approve none of this time as reasonable as
it was not within the scope of Shields' requested engagement and
appears duplicative of primary bankruptcy counsel's services.

>        **c.  Schedules/SOFA/Top 20:  3.8 hours/$1,590 of fees.**
The court will approve none of this time as reasonable as it was
not within the scope of Shields' requested engagement and appears
duplicative of primary bankruptcy counsel's services.

>        **d.  Litigation Matters: 296.7 hours/$88,033 of fees.**
Time billed in this category appears to in fact relate to the
Malpractice/Malfeasance Litigation that the Ordinary Course
Motion described that Shields would solely handle.  The court
will approve all of this time as reasonable.

>        **e.  Plan and Disclosure Statement:  77.45 hours/$32,830
of fees.**    The court will approve none of this time as
reasonable as it was not within the scope of Shields' requested
engagement and appears duplicative of primary bankruptcy
counsel's services.[9]

>        **f.  Retention and Fee Application: 23.8 hours/$9,735 of
fees.**  Time billed in this category would be at the rate of
$409.03 per hour ($9,735 divided by 23.8 hours).  This includes
time spent on preparing and prosecuting Applicant's retention
papers and fee application, as well as some pertaining to the
Ordinary Course Motion.  None of these were contested.  The

---

[9] The court realizes that some of the tasks put into the bankruptcy
categories used by the Applicant might have somehow been connected to
or related to the Malpractice/Malfeasance Litigation—although slotted
into a category such as "Plan and Disclosure Statement."  However, the
court believes it amply gave Shields the benefit of the doubt on this.
In fact, the court took Shields at its word that all time in the
"Litigation" category reasonably related to the
Malpractice/Malfeasance Litigation, when arguably, some of this time
seems to have strayed into other areas.

retention papers were form-like in nature.  As Shields was approved on an ordinary-course basis, there were no "connections" to disclose, describe, and analyze.  Projects in this category are ones that can largely be completed by paralegals and should not become a fee-generating cash cow in and of themselves.  The court cannot conclude that all of this time in this category was "reasonable," considering **the nature**, **the extent** and **the value** of such services.  Specifically, here the court finds and concludes that fees in this category were extraordinary and unreasonable because the average rate ($409.03) was not commensurate with the complexity of the tasks.  Most of this time in this category should have been incurred by paralegals or junior associates.  <u>**The court will reduce the fees in this category by $4,499, concluding that the time in this category should have been billed at no more than $220 per hour ($220 times 23.8 hours equals $5,236)—which would be reasonable fees for the tasks described (and in the context of the complexity of this case).**</u>

>    (ii.) <u>**Specific Expenses Sought and Disallowed.**</u>

4.    The Final Fee Application seeks reimbursement for $13,334.58 of expenses during the application period.  The court will allow all of these as reasonable.

D.    **CONCLUSION.**

In summary, the court has determined that the fee request should be reduced by <u>**$58,764.**</u>  Thus, the court is allowing final fees in this case of <u>**$91,149**</u> and final expenses of <u>**$13,334.58**</u> for a total award of <u>**$104,483.58**</u> for the entire case.  All other amounts are denied as duplicative and beyond the scope of Shields' engagement.  Counsel is directed to return any unused retainer it holds in excess of the unpaid amounts.

It is so **ORDERED.**

>                **###END OF ORDER###**